PIERRE S. DU PONT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69674. Promulgated June 30, 1938.

*J. S. Y. Ivins, Esq., P. W. Phillips, Esq., Laurence Graves, Esq., J. H. Cassidy, Esq.,* and *Joseph M. Hartfield, Esq.,* for the petitioner.

*Mason B. Leming, Esq., James D. Head, Jr., Esq., J. Arthur Adams, Esq., L. J. Schwartz, Esq., H. L. Brown, Esq.,* and *Hugh R. Dowling, Esq.,* for the respondent.

DISNEY: The petition placed in issue a deficiency determined by the Commissioner in the sum of $164,477.31, for the year 1929. By second amended answer, respondent asked for an increased deficiency in the sum of $617,316.88. An issue as to deduction of contributions has been disposed of by stipulation, and decision thereon will be entered under Rule 50. The issues for our determination are: (1) An issue as to deduction of losses claimed in sales of stock; (2) an issue as to deductions claimed of payments to the Christiana Securities Co. and the Delaware Realty & Investment Co.; and (3) an issue as to income from the Simms Petroleum Co. Syndicate. Each issue when stated will be followed by findings of fact and opinion thereon.

### Issue as to Deduction of Losses on Sales of Stock.

This issue is common to this proceeding and to the proceeding in Docket No. 69673, John J. Raskob, and the evidence being the same in both proceedings on this issue, and having been incorporated in the record in proceeding No. 69673 by reference from this proceeding, the findings of fact also hereinafter set forth and opinion on this issue will be adopted by reference in the proceeding No. 69673.

This issue involves claim of losses on alleged sales of stock made by the petitioner and John J. Raskob to each other in the year 1929. Petitioner in his income tax return for 1929 claimed, with respect to this issue, a deduction of $3,120,645.69 for alleged losses on the sale of certain stocks. This deduction was disallowed, in the determination of deficiency by the respondent, to the extent of $1,174,596.98 because of the purchase of similar stocks within 30 days, but was allowed above that amount. The issue arises upon respondent's second amended answer, alleging error on his part in allowing deductions in the amount of $1,946,048.71 and asserting claim accord-

ingly for an increased deficiency. Petitioner has withdrawn his reply contesting the matter as to the disallowance of $1,174,596.98, and the issue therefore arises upon respondent's prayer for an increased deficiency as to the balance.

The question here for decision is in effect whether the sales were real or lacked bona fides, involving the question as to whether there was an agreement between the petitioner and John J. Raskob for reacquisition of the stocks allegedly sold.

### FINDINGS OF FACT.

1. In 1900 John J. Raskob, hereinafter referred to as Raskob, entered the employ of Pierre S. du Pont, the petitioner, hereinafter sometimes referred to as du Pont, in the latter's office in Lorain, Ohio, and for two years thereafter kept his books and did his stenographic work. In 1902 they moved to Wilmington, Delaware, and for six or eight years thereafter Raskob, in addition to looking after personal affairs of du Pont and keeping his books and accounts, was employed by the E. I. du Pont de Nemours & Co., hereinafter referred to as the du Pont Co. Raskob left the employ of du Pont in 1910.

In 1910, when du Pont was treasurer of the du Pont Co., Raskob was his assistant and assistant treasurer of the du Pont Co. Thereafter du Pont was elected to the office of acting president of the du Pont Co., then president, and finally chairman of the board of directors, which position he now occupies.

Raskob succeeded du Pont as treasurer of the du Pont Co., and when du Pont resigned one of his offices, was elected vice president in charge of finance of the du Pont Co., which position Raskob still occupies.

In about 1915 du Pont and Raskob became connected with the General Motors Corporation. In 1928 du Pont was chairman of the board of directors and Raskob was a director, vice president, and chairman of the finance committee of the General Motors Corporation. They resigned from those offices, except as directors, in the middle of 1928. The petitioner and Raskob were directors and members of the finance committee of the General Motors Corporation in 1929. In 1929 and 1930 they were also directors of the Bankers Trust Co., New York, N. Y.

In 1929 the petitioner and Raskob maintained offices at 230 Park Avenue, New York, connected by a common reception room; they discussed matters in either office they happened to be in at the time, occupied offices on the same floor of the du Pont Building, Wilmington, Delaware, and maintained residences in the same apartment building in New York City.

The petitioner and Raskob were never partners. They have on several occasions participated in joint purchases of securities, and Raskob at the request of du Pont has purchased securities for the latter's account, and on one occasion in June 1929 was authorized by du Pont to sell stock for him. At times du Pont has acquired and sold stock after consulting Raskob.

The petitioner and Raskob have been intimately associated in business and in social life since 1900.

2. In their individual income tax returns for 1929 the petitioner and Raskob each reported gross income, including gains derived from the sale of noncapital securities, in excess of the amount of his stock loss deductions involved herein. Other deductions exceeded the difference between gross income and such deductions, leaving no net income subject to normal tax. For the same year the petitioner and Raskob each reported a large amount of net capital gain.

3. The stock market crashed the latter part of October 1929. On October 29, 1929, du Pont endeavored without success to become a member of a so-called bankers' pool then in operation to assist in the protection of the stock market. In October and November 1929, du Pont expended about $20,000,000 purchasing stock and taking up stock accounts. Petitioner's books show expenditures of about $15,000,000 in the market, of which amount approximately $5,500,000 was expended prior to October 23, 1929, when the stock market started to crash.

In October 1929 du Pont had money on deposit with the Bankers Trust Co., from which the bank made call loans to brokers. On October 29, 1929, the account was closed out and the proceeds, amounting to $25,800,000, were credited by the bank to du Pont's checking account. The bank took over the loans for its own account.

4. During a conversation held in New York City, after 3 p. m., November 12, 1929, du Pont told Raskob that he had blocks of securities to sell in order to record losses for income tax deduction purposes, but did not desire to sell large quantities of stock in a market just recovering from a panicky condition, which he was, and was known to be, supporting. In reply Raskob informed du Pont that he also had securities to sell to establish losses for the same purpose, and that he would take du Pont's stock provided he could sell a somewhat similar amount.

5. On November 13, 1929, the petitioner and Raskob each prepared a list of stocks he was willing to sell to the other for the purpose of establishing losses for income tax purposes, and, after some discussion of the transaction in their offices at 230 Park Avenue, New York City, they agreed upon the sale to each other of shares of certain stocks at

prices within the stock market price of the day for the stocks, but did not discuss the matter as to what market price or at what particular time. Thereafter on the same day du Pont wrote the following letters to Raskob:

NOVEMBER 13TH, 1929.

JOHN J. RASKOB, Esquire,
 *230 Park Avenue, New York City.*

DEAR JOHN: This is to confirm sale to you of the following securities and to acknowledge receipt of your check for $4,582,750.00 in payment therefor:

| | |
|---|---|
| 56,500 General Motors at 36 | $2,034,000 |
| 10,000 Anaconda at 70 | 700,000 |
| 10,000 Baltimore & Ohio at 105 | 1,050,000 |
| 4,500 Kennecott at 49½ | 222,750 |
| 6,400 du Pont at 90 | 576,000 |
| | $4,582,750 |

Sincerely yours,

[Signed] PIERRE S. DU PONT.

NOVEMBER 13, 1929.

J. J. RASKOB, Esq.,
 *230 Park Avenue, New York City.*

DEAR JOHN: I herewith confirm purchase from you of the following:

| | |
|---|---|
| 100,000 shares Warner Bros. at 31 | $3,100,000 |
| 30,000 shares Simms Petroleum at 17 | 510,000 |
| 8,000 shares Checker Cab at 31 | 248,000 |
| 14,000 shares American International at 32 | 448,000 |
| 2,000 shares Natl. Cash Register at 60 | 120,000 |
| 500 shares Otis Elevator at 200 | 100,000 |
| 1,000 shares Bank of United States at 80 | 80,000 |
| | $4,606,000 |

Enclosed herewith is my check to your order on the Bankers Trust Company, covering this amount.

Sincerely yours,

[Signed] PIERRE S. DU PONT.

Raskob did not confirm his purchases from, and sales to, du Pont by letter.[1] All the securities were common stock of the respective corporations, except those of the Bank of United States, whose shares of stock were classified as units.

6. The stocks involved in the sales, excepting Bank of United States, were, at all times important, listed on the New York Stock Exchange. The units of stock of the Bank of United States were listed on the New York Produce Exchange. The prices per share at which the petitioner and Raskob sold the stocks and the low, high, opening, and

---

[1] The words "purchase" and "sale" and other words of like import will, for convenience, be used throughout these findings of fact and the opinion herein without reference to the bona fides or reality of sale, leaving that question for final determination.

closing sales prices of the stocks per share on the exchanges on November 13, 1929, were as follows:

| | Low | High | Open | Close | Du Pont sold at— |
|---|---|---|---|---|---|
| Kennecott Copper Corp | 49⅜ | 58 | 55⅝ | 50½ | 49½ |
| Baltimore & Ohio R. R. Co | 105 | 112½ | 110 | 105 | 105 |
| E. I. du Pont de Nemours & Co | 90 | 96 | 95 | 90 | 90 |
| General Motors Corp | 36⅛ | 39½ | 38¾ | 36⅛ | 36 |
| Anaconda Copper Mining Co | 70 | 77⅞ | 76½ | 70½ | 70 |

| | Low | High | Open | Close | Raskob sold at— |
|---|---|---|---|---|---|
| Warner Bros. Pictures, Inc | 30 | 35⅝ | 34⅝ | 30⅝ | 31 |
| Simms Petroleum Co | 15 | 18½ | 18 | 17 | 17 |
| Checker Cab Mfg. Co | 29⅞ | 33 | 31 | 29⅞ | 31 |
| Amer. International Corp | 30¼ | 35 | 35 | 30⅞ | 32 |
| National Cash Register Co | 59 | 64⅛ | 63 | 63 | 60 |
| Otis Elevator Co | 195 | 200 | 200 | 195 | 200 |
| Bank of United States— | | | | | |
| Nov. 11, 1929 | 95 | 101 | 101 | 95 | 80 |
| Nov. 12, 1929 | 82 | 85 | 82 | 82 | --------- |
| Nov. 14, 1929 | 70 | 81 | 81 | 76 | --------- |

General Motors Corporation stock also was quoted as follows:

| | Low | High | Open | Close |
|---|---|---|---|---|
| Nov. 11, 1929 | 40 | 42¼ | 42¼ | 40 |
| Nov. 12, 1929 | 39 | 40¼ | 39⅝ | 39 |
| Nov. 14, 1929 | 36 | 38 | 36⅛ | 38 |

There was no sale of units of stock of the Bank of United States on the New York Produce Exchange November 13, 1929. Du Pont did not check Raskob's prices the day of the sale to determine whether they were the low stock market sales prices of the stocks on that day. Neither petitioner nor Raskob was aware of the fact that Raskob's sales prices were above the low stock market sales prices for the stocks on November 13, 1929, until a few days prior to the hearing herein, when du Pont ascertained the fact by his own efforts and informed Raskob.

7. Raskob personally delivered his check for $4,582,750 to du Pont or du Pont's New York secretary on November 13, 1929, with instructions not to deposit the check until he had received du Pont's check for $4,606,000. The check was drawn on the Bankers Trust Co., Madison Avenue at 57th Street Branch, New York City, where Raskob's checking account with the Bankers Trust Co. was maintained. The date of the check, the name of the payee, and the signature are in Raskob's handwriting. The check was originally dated as November 12, 1929, and when Raskob discovered the error he changed the date to November 13, 1929, by writing the figure 3 over the figure 2.

Du Pont's check for $4,606,000 was written on a stationers' form of check, was dated November 13, 1929, was given and now bears No. 247 and was drawn on the main office of the Bankers Trust Co., where du Pont maintained a checking account.

8. On November 15, 1929, Raskob caused Harold G. Seer, his security analyst and the manager of his New York office, to make out slips for the deposit of the checks referred to in finding No. 7 to the credit of the respective payees thereof in the Bankers Trust Co. Raskob personally placed the deposit slips and checks in a single envelope and delivered them, together with letters of transmittal, by messenger to a receiving teller of the main office of the Bankers Trust Co. The letter transmitting Raskob's check was written on du Pont's letterhead, dated November 14, 1929, and signed "Pierre S. du Pont, C McA" by C. A. McAllister, secretary to du Pont in his New York office. The letter transmitting du Pont's check was written on Raskob's letterhead, dated November 15, 1929, and signed by Harold G. Seer, secretary. The branch office had a bookkeeping system independent of the main office.

The credit balance in du Pont's checking account at the Bankers Trust Co. was sufficient to pay his check without previously depositing Raskob's check. Du Pont's check was credited, and Raskob's check in favor of du Pont was charged, to Raskob's checking account at the branch office on November 15, 1929. The closing balance in Raskob's checking account there was less than $40,000 during the period from November 12 to November 15, 1929, inclusive.

9. On November 15, 1929, Raskob wrote two letters from New York City to Frank L. Garey, secretary of Raskob's Wilmington, Delaware, office, hereinafter referred to as Garey, in one of which he informed Garey that "I have drawn check on the Bankers Trust Co. today for $4,582,750 in payment" of the stocks purchased for his account, and in the other he informed him that he had deposited du Pont's check for $4,606,000, covering the proceeds of the sale of stocks sold to du Pont on November 13, 1929, to his credit in the Bankers Trust Co. Raskob used the word "today" in his letter by mistake. The letters were dictated but not personally signed by Raskob. The receipt of Raskob's letter was the first information Garey had of the drawing of the check.

10. On November 22, 1929, the petitioner and Raskob delivered to each other at their Wilmington, Delaware, offices, accompanied by letters of transmittal, certificates for the stocks sold on November 13, 1929, and promptly thereafter the stock certificates were surrendered for transfer to and reissuance in their respective names.

11. The transaction of November 13, 1929, was entered in the books of account of the petitioner and Raskob as sales and purchases of the stocks, the entries of petitioner being made under the date of

November 13, 1929. The entries in Raskob's books for the stocks purchased by him were made under the date of November 15, 1929, and on or about December 1, 1929, when Raskob's canceled check was received from the bank, the words and figures "Bot. Nov. 13, 1929" were written on the margin of the entries in Raskob's cash book, and the dates of the entries made in the ledger, except the date of the entry made for the purchase of shares of stock of the Anaconda Copper Mining Co., were changed from November 15, 1929, to November 13, 1929. The entry for the Anaconda Copper Mining Co. stock was not changed. Entries as to the sales in Raskob's books appear under date of November 13, except as to the Bank of United States and American International Corporation, which appear in the ledger under date of November 30 because of errors in posting. No alterations appear in the sales entries.

12. Du Pont kept the check book for his checking account with the Bankers Trust Co. in his Wilmington office and no one else ever signed checks drawn against the account. The check stubs constituted his cash book for deposits in and withdrawals from the account.

13. After 3:30 p. m., on November 13, 1929, du Pont's New York secretary prepared for his signature, pursuant to a telephone request made by an employee of du Pont from his Wilmington office, and du Pont signed in New York, a check bearing the printed number 244, drawn on the Bankers Trust Co. for the amount of $163,190, in payment for stock purchased by du Pont through a Wilmington broker on November 12 and November 13, 1929. The check was entered in the stub for check No. 245 in Wilmington on November 13, 1929, as a check issued on that date.

14. On November 14, 1929, du Pont's New York secretary prepared, and du Pont signed in New York, a check bearing the printed number 245, drawn on his account with the Bankers Trust Co. in favor of the County Trust Co. of New York for $500,000. The check was entered in the stub for check No. 244 in Wilmington as a check issued on November 14, 1929.

15. After 3:35 p. m., on November 14, 1929, du Pont's New York secretary prepared, pursuant to a telephone request made by an employee of du Pont from his Wilmington office, and du Pont signed in New York, a check bearing the printed number 246, drawn on the Bankers Trust Co. for $920,285, in payment for stock purchased by du Pont from a Wilmington broker on the same day. The check was entered in its proper stub on November 14, 1929. The check was transmitted to the New York office of the broker by a letter bearing the date of November 14, 1929, and the receipt of the check was acknowledged by the payee thereof in a letter bearing the date of

November 15, 1929. The original check No. 247 is still pinned, unused, to the stub book.

16. At some undisclosed time the printed numbers on the stubs of checks Nos. 244 and 245 were crossed out and the figures 245 were inserted for the printed No. 244, and the figures 244 were inserted for the printed No. 245.

17. The check stub book for du Pont's checking account with the Bankers Trust Co. shows his balance in the account, reasons for withdrawals, and details for deposits.

Each sheet of the book contains stubs for three checks, the stubs for checks bearing the printed numbers 244, 245, and 246 being on one sheet. The aggregate amount of checks Nos. 244, 245, and 246 was deducted from the balance in the account after issuing check No. 243 on November 12, 1929, and the remainder was carried over to the top of the next sheet. The amount of check No. 247, which was entered in the stub not later than November 15, 1929, as a check issued on November 13, 1929, together with the total of checks Nos. 248 and 249, which were entered as having been issued on November 15, 1929, was then deducted from the new balance.

The check stub book contains checks bearing consecutive printed numbers from 1 to 296, inclusive, all of which were issued or canceled during the period from June 20, 1919, to August 27, 1930. The dates on the check stubs are in proper chronological order in relation to the original printed numbers of the checks, except the dates appearing on the stubs for checks Nos. 244, 245, and 247.

18. Raskob's check for $4,582,750 in favor of du Pont was first entered in du Pont's check stub book as a deposit made on November 15, 1929. The figure 5 in the date was thereafter erased and the figure 3 inserted in red ink in lieu thereof. The details for the deposit were made under the caption "Sold 11/13/1929."

19. The selling price of $4,606,000 for the stocks sold by Raskob to du Pont on November 13, 1929, is $198,000 in excess of an amount computed upon the basis of the low stock market quotations of all the stocks on November 13, 1929, except Bank of United States, and $80 per unit for the Bank of United States stock.

20. The stock market sales prices on November 15, 1929, for the stocks sold by the petitioner and Raskob to each other on November 13, 1929, were, with a few exceptions, higher than on November 13 and November 14. Based upon the opening and low stock market quotations, on November 15, 1929, the stocks sold by the petitioner and Raskob had the following market values in excess of the amounts for which they sold the stocks on November 13, 1929:

| | Opening | Low |
|---|---|---|
| Du Pont | $535,287.50 | $509,200 |
| Raskob | 977,000.00 | 896,000 |

21. On November 14, 1929, Raskob sold to Archmere, Inc., a Delaware corporation all of whose stock was owned by Helena S. Raskob, Raskob's wife, from 1928 to and through the year 1931, for $36.50 per share, 50,000 of the 56,500 shares of common stock of the General Motors Corporation which he had purchased from du Pont on November 13, 1929. The 56,500 shares were evidenced by one certificate issued to Raskob November 23, 1929. On December 17, 1929, at Raskob's request the General Motors Corporation reissued the certificate by issuing one certificate in favor of Archmere, Inc., for 50,000 shares and another certificate in favor of Raskob for 6,500 shares. The certificate for 50,000 shares was delivered to Archmere, Inc., on December 17 or 18, 1929. Raskob recorded in his books, and reported in his income tax return for the taxable year, a gain of $25,000 realized from the sale, and paid the tax thereon. The respondent has made no adjustment with respect to the profit so reported. Du Pont did not learn of the sale until the year 1937.

22. On December 12, 1929, and January 3, 1930, the General Motors Corporation paid to its common stockholders of record on November 23, 1929, in accordance with resolutions adopted by its finance committee on November 12, 1929, and its board of directors at a meeting held November 14, 1929, both of which meetings the petitioner and Raskob attended, a regular dividend of 75 cents per share and an extra dividend of 30 cents per share, respectively. As a record stockholder on November 23, 1929, of 56,500 shares of stock, Raskob received dividend checks aggregating $59,325. Having sold 50,000 shares of stock outstanding in his name to Archmere, Inc., prior to the record date for dividend purposes, out of the amount of dividends he received, Raskob on December 16, 1929, and January 3, 1930, paid a total of $52,500 to Archmere, Inc.

23. On December 18, 1929, Raskob, without first receiving the consent of du Pont, delivered the certificate he held for 6,500 shares of stock of the General Motors Corporation to a broker for credit in a short account he maintained with the broker. Raskob did not request du Pont's permission to dispose of the stock in that manner and du Pont was unaware until the year 1937 that the transaction had occurred. Raskob concluded that the crediting of the stock in his short account resulted in ordinary gain of $176,256.40, which amount he reported in his income tax return for the taxable year and paid the tax thereon. The respondent has never made any adjustment with respect to the profit so reported.

24. On January 3, 1930, petitioner and Raskob discussed the sale to each other of Warner Brothers Pictures, Inc., stock and General Motors stock and the other securities sold on November 13, 1929, and this conversation led to further discussion on January 6, 1930, upon which date each sold to the other all of the securities

he had purchased from the other on November 13. The only reason the sale was not made on January 3 was lack of time to consummate it.

25. On January 6, 1930, the petitioner wrote the following letters to Raskob, confirming his purchase and sale:

JANUARY 6th, 1930.

JOHN J. RASKOB, ESQ.,
 *230 Park Avenue, New York City, New York.*

DEAR SIR: Confirming purchase from you today of the following securities:

| | |
|---|---:|
| 56,500 shrs. General Motors, Com at 41.125 | $2, 323, 562. 50 |
| 10,000 shrs. Anaconda Copper at 75.25 | 752, 500. 00 |
| 10,000 shrs. Baltimore & Ohio R. R. Co., at 116 | 1, 160, 000. 00 |
| 4,500 shrs. Kennecott Copper at 59.125 | 266, 062. 50 |
| 6,400 shrs. E. I. duPont de Nemours & Co., Common at 117.50 | 752, 000. 00 |
| Total | $5, 254, 125. 00 |

Very truly yours

PIERRE S. DU PONT.
[Signed] PIERRE S. DU PONT

RTE/t

JANUARY 6th, 1930.

JOHN J. RASKOB, ESQ.,
 *230 Park Avenue, New York City, New York.*

DEAR SIR: I beg to confirm sale to you today of the following stocks:

| | |
|---|---:|
| 100,000 shrs. Warner Brothers Pictures, Inc. at 40¼ | $4, 025, 000. 00 |
| 30,000 shrs. Simms Petroleum at 25¾ | 772, 500. 00 |
| 8,000 shrs. Checker Cab at 37.125 | 297, 000. 00 |
| 14,000 shrs. American International at 37.875 | 530, 250. 00 |
| 2,000 shrs. National Cash Register at 75.375 | 150, 750. 00 |
| 500 shrs. Otis Elevator at 283 | 141, 500. 00 |
| 1,000 shrs. Bank of U. S. at 72.50 | 72, 500. 00 |
| Total | $5, 989, 500. 00 |

Delivery of these stocks has been made. At your convenience, will you kindly forward your check, payable to Mr. duPont, to cover?

Very truly yours,

PIERRE S. DU PONT.
[Signed] PIERRE S. DU PONT

RTE/t

26. On January 7, 1930, Garey, acting for Raskob, wrote the following letters to du Pont:

JANUARY 7, 1930.

P. S. DUPONT, ESQ.
 *duPont Bldg. Wilmington, Delaware.*

DEAR SIR:—This is to confirm the sale to you of:

| | |
|---|---:|
| 56,500 shs. General Motors, Com. at 41.125 | $2, 323, 562. 50 |
| 10,000 shs. Anaconda Copper at 75.25 | 752, 500. 00 |
| 10,000 shs. Baltimore & Ohio R. R. Co. at 116 | 1, 160, 000. 00 |
| 4,500 shs. Kennecott Copper at 59.125 | 266, 062. 50 |
| 6,400 shs. E . I. duPont de Nemours & Co. Common at 117.50 | 752, 000. 00 |
| Total | $5, 254, 125. 00 |

Powers of Attorney covering the transfer of the said stock, together with certificates are enclosed herewith, with the exception of 56,500 shares of Gen-

eral Motors Corporation common stock, which will be delivered to you on Saturday, January 11.

Will you kindly acknowledge receipt on the attached carbon of this letter, and oblige,

Yours very truly,

J. J. RASKOB

By [Signed] FRANK L. GAREY.

Secretary.

G–R

JANUARY 7, 1930.

P. S. DUPONT, Esq.

DuPont Building, Wilmington, Delaware.

DEAR SIR: This is to confirm the purchase from you of the following stocks:

| | |
|---|---:|
| 100,000 shrs. Warner Brothers Pictures, Inc. at 40¼ | $4, 025, 000. 00 |
| 30,000 shrs. Simms Petroleum at 25¾ | 772, 500. 00 |
| 8,000 shrs. Checker Cab at 37.125 | 297, 000. 00 |
| 14,000 shrs. American International at 37.875 | 530, 250. 00 |
| 2,000 shrs. National Cash Register at 75.375 | 150, 750. 00 |
| 500 shrs. Otis Elevator at 283 | 141, 500. 00 |
| 1,000 shrs. Bank of U. S. at 72.50 | 72, 500. 00 |
| Total | $5, 989, 500. 00 |

In payment of the above I am enclosing my check for $5,289,500.00 and 6% demand note, dated January 6, for $700,000.

Kindly acknowledge receipt on the attached carbon of this letter.

Yours very truly,

J. J. RASKOB

By [Signed] FRANK L. GAREY.

Secretary.

G–R

27. The petitioner did not desire to lose cash in connection with the transaction and he had an understanding with Raskob that the sales would be made for cash. Raskob left Wilmington for New York at noon January 6, 1930. When the prices for the stocks had been figured by Garey in conjunction with du Pont after the New York Stock Exchange closed on January 6, 1930, Garey informed Raskob by telephone in New York of the amounts involved in the transaction. Thereafter on the same day du Pont, at the request of Raskob, consented to accept from Raskob a demand note for $700,000 in connection with the transaction. Raskob's note for $700,000, payable on demand with interest at the rate of 6 percent per annum, and check drawn on the Bankers Trust Co. on January 6, 1930, in favor of du Pont for $5,289,500, were delivered to du Pont on January 7, 1930. Du Pont did not ask Raskob for security and no collateral was deposited for the payment of the note. On January 6, 1930, du Pont drew a check against his account in the Bankers Trust Co. in favor of Raskob for $5,254,125 in payment of the stocks he acquired from Raskob that day.

28. The prices agreed upon for the stocks the petitioner and Raskob sold to each other on January 6, 1930, were the low sales prices of the respective stocks, excepting Bank of United States, on the New York Stock Exchange on that day. The low and high sales prices of Bank of United States stock on the New York Produce Exchange on January 6, 1930, were $73 per share.

29. On January 6, 1930, du Pont delivered to Garey, acting for Raskob, certificates for the stocks sold to Raskob on that day. On January 7, 1930, Garey, acting for Raskob, delivered to du Pont certificates for the stock Raskob sold to du Pont on January 6, 1930, except certificates for the General Motors stock. Promptly thereafter the petitioner and Raskob surrendered the certificates for reissuance in their respective names.

30. Raskob's check for $5,289,500 and du Pont's check for $5,254,-125 were mailed together by agreement from Wilmington on January 7, 1930, to the main office of the Bankers Trust Co. for deposit, and were credited to their respective checking accounts on January 8, 1930. The opening balance on January 6, 1930, in du Pont's checking account in the Bankers Trust Co. was $183,408.31. No debit or credit entries were made in the account on January 6 or January 7, 1930. Du Pont's balance in the account at the close of January 8, 1930, was $218,755.53 after entries had been made therein for the two checks referred to above, and the balance in his call loan account on the same day with the same institution was $11,000,000. At the close of January 6, 1930, the credit balance in Raskob's checking account in the Bankers Trust Co. was $2,161,665.89. Of this amount $1,750,000 represented money borrowed on January 3, 1930, for other purposes. Aside from this credit balance, Raskob did not have sufficient cash to complete the transaction with du Pont on a cash basis.

31. On January 3, 1930, Raskob increased his loan at the Bankers Trust Co. by the amount of $1,750,000 and as collateral therefor deposited 40,000 shares of Warner Brothers Pictures, Inc., stock, 30,000 shares of stock of the Anaconda Copper Mining Co., and 6,500 shares of stock of the General Motors Corporation, the certificate used for the General Motors Corporation stock being the same one delivered to a broker on December 18, 1929, for credit to his short account. Raskob did not consult du Pont about his pledge of stock of the General Motors Corporation, and du Pont was unaware of such use of the securities until the year 1937. To obtain the necessary shares of stock of the General Motors Corporation for delivery to du Pont under the sale of January 6, 1930, Raskob withdrew the certificate for 6,500 shares from the Bankers Trust Co. on January 8, 1930, and borrowed 50,000 shares from Archmere, Inc., the stock borrowed being the identical shares sold by Raskob to Archmere, Inc., on November 14, 1929. Raskob transmitted the certificates to du Pont

on January 10, 1930, and on January 11, 1930, du Pont took the necessary action to have the certificates reissued in his name. Raskob did not inform du Pont, and du Pont was unaware, that he (Raskob) would have to borrow 50,000 shares of General Motors Corporation stock for delivery under the January 6, 1930, sale.

32. On November 14, 1929, Raskob purchased 9,000 shares of stock of the Anaconda Copper Mining Co. from his wife at $78 per share. At the beginning of January 6, 1930, Raskob held 45,000 shares of stock of the Anaconda Copper Mining Co., of which 30,000 shares were on deposit with the Bankers Trust Co. as collateral for a loan. On that day he sold 9,000 shares to his wife at $77.50 per share. The selling price per share of the stock on the New York Stock Exchange on the date of sale ranged from a low of 75¼ to a high of 78½. On January 7, 1930, Raskob delivered certificates for 10,000 shares of the stock to du Pont under his January 6, 1930, sale, and on January 8, 1930, he delivered certificates for 3,000 shares to the Bankers Trust Co. as additional security for his loan, leaving 2,000 shares in his possession. Certificates for these 2,000 shares, together with certificates for 7,000 of the 14,000 shares involved in the January 27, 1930, transaction with du Pont, were surrendered on February 7, 1930, and reissued in the name of Raskob's wife.

33. The transaction of January 6, 1930, was entered in the books of the petitioner and Raskob as sales and purchases of stock.

34. Other than the transactions described above, du Pont never had any transactions involving stock of the National Cash Register Co., Otis Elevator Co., or Bank of United States.

35. On December 26, 1929, in Wilmington, Delaware, du Pont informed Raskob that he desired to sell 40,000 shares of Warner Brothers Pictures, Inc., stock in order to record losses for income tax deduction purposes and asked Raskob whether he would purchase the securities. Du Pont did not want to sell the stock through a stock exchange. Raskob replied by saying that he would be glad to buy the stock but that he would be compelled to sell some securities to raise funds for the purchase. Du Pont then informed Raskob that he would buy the stock and Raskob offered du Pont shares of stock of the Baltimore & Ohio Railroad Co. and Anaconda Copper Mining Co. for purchase.

36. On December 26, 1929, du Pont wrote letters to Raskob reading as follows:

DECEMBER 26th, 1929.

JOHN J. RASKOB, Esq.,
230 Park Avenue, New York City, New York.
Dear Sir:—
Confirming sale to you, I enclose herewith certificates aggregating forty thousand (40,000) shares of the common stock of Warner Brothers Pictures, Inc. (certificate numbers described on attached sheet), also, power of attorney

covering the same. I also enclose herewith check in the amount of $1,600.00 covering the transfer taxes on the above shares. Sale price $39.00.

Kindly acknowledge receipt on the attached copy of this letter, and oblige,

Very truly yours,

PIERRE S. DUPONT.

[Signed] PIERRE S DU PONT

Encls.
Registered.

DECEMBER 26th, 1929.

JOHN J. RASKOB, Esq.,
. *230 Park Avenue, New York City, New York.*

Dear Sir:—Enclosed find my check payable to your order in the amount of $1,569,000.00, covering the purchase of:—

| | |
|---|---:|
| 5,000 shrs. Baltimore & Ohio Co., at $115_____ | $575,000.00 |
| 14,000 shrs. Anaconda Copper Co., at 71_____ | 994,000.00 |
| TOTAL_____ | $1,569,000.00 |

Very truly yours,

PIERRE S. DUPONT.

[Signed] PIERRE S DU PONT

M/t
Encl.

37. Raskob wrote the following letters to the petitioner in connection with the transaction:

DECEMBER 27, 1929.

Mr. PIERRE S. DUPONT,
*DuPont Building, Wilmington, Delaware.*

DEAR MR. DUPONT: I acknowledge receipt of your letter of December 26th enclosing check for $1,569,000.00 covering the sale to you of

| | |
|---|---:|
| 5,000 shs. Baltimore & Ohio R. R. Co. com. stk_____ | $575,000.00 |
| 14,000 shs. Anaconda Copper Mining Co. com. stk_____ | $994,000.00 |
| TOTAL_____ | $1,569,000.00 |

Certificates Nos. 333,502/641 for 14,000 shares Anaconda Copper Mining Company common stock, and certificates Nos. C–199096/145 for 5,000 shares Baltimore & Ohio R. R. Company common stock, together with Powers of Attorney, are enclosed. Also check to your order for $480.00 covering stock transfer tax.

Yours very truly,

[Signed] J. J. RASKOB.

———

DECEMBER 27, 1929.

Mr. PIERRE S. DUPONT,
*DuPont Building, Wilmington, Delaware.*

DEAR MR. DUPONT: I am enclosing herewith my check to your order for $1,560,000.00 covering the purchase from you of 40,000 shares Warner Bros. Pictures, Inc., common stock at $39.00 per share.

Very truly yours,

[Signed] J. J. RASKOB.

38. The sales prices of the shares of stock of Warner Brothers Pictures, Inc., and Anaconda Copper Mining Co. were the low sales prices of the stock on the New York Stock Exchange on December

26, 1929. The opening, closing, and low sales prices, and the high sale price of stock of the Baltimore & Ohio Railroad Co. on the same exchange on the same day were 115½ and 116⅜, respectively. The closing price of Baltimore & Ohio Railroad Co. stock on December 24, 1929, was 115.

39. On December 27, 1929, du Pont delivered to Raskob and Raskob delivered to du Pont in Wilmington their checks drawn on the Bankers Trust Co. for $1,569,000 and $1,560,000, respectively, in payment of the stocks purchased on December 26, 1929, and certificates for the shares of stock involved in the transaction. On that day the petitioner and Raskob surrendered the certificates for reissue in their respective names, and the checks were mailed in one envelope to the main office of the Bankers Trust Co. for deposit in their checking accounts. The deposits were entered in the accounts on December 28, 1929.

40. The credit balances in the checking account of du Pont at the Bankers Trust Co. at the close of December 26, and December 28, 1929, after appropriate entries had been made therein for the checks referred to in finding No. 39, were $144,818.62 and $135,818.62, respectively. In addition, he had a balance of $11,000,000 in his call loan account at the same institution on December 26, 27, and 28, 1929. The credit balances in the checking account of Raskob at the Bankers Trust Co. throughout December 26, 1929, and at the close of December 28, 1929, after appropriate entries had been made therein for the checks referred to in finding No. 39, were $239,307.01 and $245,224, respectively. His balance at the close of December 27, 1929, was $236,224.

41. The transaction of December 26, 1929, was entered in the books of the petitioner and Raskob as sales and purchases of stock.

42. During the late afternoon of November 14, 1929, Raskob wrote the following letter to the Bankers Trust Co., New York, New York:

In reply to your letter of November thirteenth, would advise that this is to confirm your action in transferring 1500 shares of American International from my custodian account to be held as collateral on my loan.

The shares of stock referred to in the letter were part of the 14,000 shares Raskob sold to du Pont on November 13, 1929. The stock was subsequently withdrawn from the bank as collateral and delivered to du Pont. Prior to the sale Raskob held 14,324 shares of the stock.

Raskob's holdings of common stock of the du Pont Co. during the period from October 1, 1929, to January 6, 1930, consisted of the 6,400 shares he purchased from du Pont on November 13, 1929.

43. In addition to the 10,000 shares of Anaconda Copper Mining Co. stock which Raskob purchased from du Pont on November 13, 1929, he purchased on November 14, 1929, 20,000 shares from Archmere, Inc., 20,000 shares from Helena S. Raskob, guardian, and 9,000 shares

from Helena S. Raskob, all at $78 per share. The entries in Raskob's ledger for the stock were made in the above order. The certificates which Raskob delivered to du Pont under the sale to him on December 26, 1929, of 14,000 shares of Anaconda Copper Mining Co. stock represented shares of stock purchased on November 14, 1929, at a cost of $78 per share. Raskob computed and claimed in his 1929 return a loss of $18,480 on the sale ($480 included for stock transfer taxes) under the "first in, first out" rule by using, as cost, 10,000 shares purchased from du Pont on November 13, 1929, at 70 and 4,000 shares purchased on November 14, 1929, at 78. A computation on the basis of identification of certificates results in a loss of $98,480. In his return for 1930 he claimed a loss of $27,500 on his sale of 10,000 shares of the same stock to du Pont on January 6, 1930. The amount was reached by using a cost basis of $78 per share, the price paid for the stock purchased on November 14, 1929. Certificates for shares purchased from du Pont on November 13, 1929, at $70 per share were delivered under the sale. On the basis of identification of certificates, the sale resulted in taxable gain of $52,500.

44. The certificates for 40,000 shares of Warner Brothers Pictures, Inc., deposited by Raskob with the Bankers Trust Co. on January 3, 1930, were certificates reissued to him for the ones delivered by du Pont under the December 26, 1929, sale. The certificates remained on deposit as security for the loan until June 13, 1930. Raskob did not consult du Pont about his pledge of the stock and du Pont was unaware until 1937 of such use of the securities.

45. Raskob was in Wilmington on January 10, 11, and 12, 1930, and left on January 13, 1930, for Palm Beach, Florida, where he remained until about the end of March 1930.

46. While in Wilmington on January 10, 1930, Raskob signed two checks, Nos. 478 and 479, against his checking account with the Bankers Trust Co. payable to the order of du Pont, with the dates and amounts left blank. At the same time he wrote, signed and postdated January 27, 1930, two letters to du Pont, with certain pertinent parts as hereinafter described left blank, one confirming the sale to du Pont of 40,000 shares of Warner Brothers Pictures, Inc., stock and the other confirming the purchase from du Pont of 14,000 shares of Anaconda Copper Mining Co. stock and 5,000 shares of stock of the Baltimore & Ohio Railroad Co. Raskob delivered the incomplete checks and letters to Garey. Raskob and Garey alone had knowledge of the writing of the incomplete postdated letters and partly blank checks on January 10, 1930. He also signed in blank, and left with Garey, certain stock powers, including powers for the transfer of shares of stock of Warner Brothers Pictures, Inc.

47. On January 27, 1930, Raskob called Garey and instructed him to see du Pont about purchasing 40,000 shares of Warner Brothers Pic-

tures, Inc., stock. He also said that it might be possible that du Pont would want to sell the Anaconda Copper Mining Co. and the Baltimore & Ohio Railroad Co. stocks sold by Raskob to du Pont on December 26, and, if so, he was willing to buy it, and that in case the sales were made, to go ahead and use the checks and letters (referring to the checks signed January 10, one of which was used, as hereinafter set forth, to pay the $700,000 note of January 6, and a note of $1,080,000 involved in the "short" sale transaction, hereinafter set forth). He also stated that if du Pont bought both blocks of Warner Brothers Pictures, Inc., stock (referring to the 40,000 shares sold December 26 and the 27,000 shares involved in the short sale transaction) he wanted to pay off his notes. He told Garey to buy and sell at current market prices as he might agree with du Pont (as to stocks sold December 26).

On January 27, 1930, Garey, acting under the instructions given by Raskob, delivered the following letters to du Pont:

JANUARY 27, 1930.

P. S. DUPONT, Esq.,
9012 Building.

DEAR MR. DUPONT: This is to confirm the sale to you of forty thousand (40,000) shares of Warner Bros. Pictures, Inc., common stock at *$50.50 per share,—$2,020,000.00.*

There is enclosed herewith certificates for 40,000 shares of the above stock, together with Power of Attorney.

Kindly acknowledge receipt on attached carbon copy of this letter and oblige,
 Very truly yours,

[Signed] JOHN J. RASKOB

P. S.
*Certificates No. AC–41901/300*
 *Check for $1600, to your order, to cover stock transfer tax at the rate of four cents per share, is enclosed.*

---

JANUARY 27, 1930.

PIERRE S. DUPONT, Esq.,
9012 Building.

DEAR MR. DUPONT: This is to confirm the purchase from you of the following stocks:

| | |
|---|---:|
| 14,000 Shs. Anaconda Copper Mining Common stock at *$72.50 per share* | *$1,015,000.00* |
| 5,000 Shs. Baltimore & Ohio R. R. Co. common stock at *$117 per sh* | *$585,000.00* |
| Total | *$1,600,000.00* |

I am enclosing herewith my check for *$1,600,000.00* in payment of above.
 Very truly yours,

[Signed] J J RASKOB

The portions of the letters without italics represent the condition of the postdated letters on January 10, 1930, when they were signed

by Raskob. The italicized portions of the letters were inserted by Garey on January 27, 1930.

48. On January 27, 1930, du Pont signed the following letters:

JANUARY 27, 1930.

JOHN J. RASKOB, Esq.,
 *9014 duPont Building, Wilmington, Delaware.*

DEAR JOHN: I herewith confirm purchase from you to-day of forty thousand (40,000) shares of the "A" stock of Warners Brothers Pictures, Inc., at a cost of $50.50 per share, and I enclose my check herewith in payment thereof in the amount of $2,020,000.00.

Very truly yours,

PIERRE S. DUPONT.

RTE/t [Signed] PIERRE S. DU PONT

_____

JANUARY 27, 1930.

JOHN J. RASKOB, Esq.,
 *Room #9012, duPont Building, Wilmington, Delaware.*

MY DEAR JOHN: I confirm sale to you to-day the following stocks:

| | |
|---|---:|
| 5,000 Capital Baltimore & Ohio R. R. Co., at $117.00, Certificates C-199542 to C-199591 inclusive_____ | $585,000.00 |
| 14,000 Common Anaconda Copper Mining Co., at $72.50, Certificates 335720 to 335859, inclusive_____ | 1,015,000.00 |
| for which you may send me your check for_____ | $1,600,000.00 |

I also enclose herewith check in the amount of $480.00 covering the New York and Federal transfer taxes on the above shares, together with power of attorney covering the same.

Kindly acknowledge receipt on the attached carbon of of [sic] this letter, and oblige

Very truly yours,

PIERRE S. DUPONT.

[Signed] PIERRE S DU PONT

RTE/t
Encl.

49. The sales prices on the New York Stock Exchange January 27, 1930, for common stock of Warner Brothers Pictures, Inc., Anaconda Copper Mining Co., and Baltimore & Ohio Railroad Co., and the prices at which sold between petitioner and Raskob, were as follows:

| | Low | High | Opening | Closing | Sold |
|---|---|---|---|---|---|
| Warner Bros. Pictures, Inc_____ | 50½ | 53⅝ | 50⅝ | 53⅝ | 50½ |
| Anaconda Copper Mining Co_____ | 72⅜ | 74⅞ | 73¼ | 73¾ | 72½ |
| Baltimore & Ohio R. R. Co_____ | 117 | 117⅞ | 117⅞ | 117 | 117 |

50. On January 27, 1930, du Pont delivered to Garey, acting for Raskob, his check dated January 27, 1930, drawn on the Bankers Trust Co. to the order of Raskob for $2,020,000 in payment of the Warner Brothers Pictures, Inc., stock purchased that day from Raskob. On the same day Garey, acting for Raskob, inserted the date "Jan. 27, 1930" and the amount of $1,600,000 in check No. 478,

which had been signed by Raskob on January 10, 1930, and delivered it to du Pont in payment of the Anaconda Cooper Mining Co. and Baltimore & Ohio Railroad Co. stock purchased from du Pont on that day. These checks and a check of du Pont drawn on the County Trust Co. to the order of the Bankers Trust Co. for $300,000 were mailed to the main office of the Bankers Trust Co. in the same envelope on January 27, 1930, for deposit, and were credited to the checking accounts of du Pont and Raskob on January 28, 1930, Raskob's check would have been good on January 27 and 28, 1930, without first depositing du Pont's check only by use of a part of the money borrowed for other purposes on January 3, 1930. The credit balance in du Pont's account prior to his deposit of $1,900,000 was $218,755.53. The balance in du Pont's call loan account at the Bankers Trust Co. on January 27 and 28, 1930, was $11,000,000.

51. On January 27, 1930, Garey, acting for Raskob, delivered to du Pont, and the latter delivered to the former, certificates for the stocks involved in the sales. The certificates delivered by Raskob were part of the 100,000 shares reissued to him for certificates received from du Pont in the January 6, 1930, transaction and were accompanied by stock powers signed by Raskob in blank prior to his departure for Florida. In computing a taxable profit of $458,400 on the shares, Garey used a cost basis of $39 per share, the price recorded in Raskob's books for the shares he purchased from du Pont on December 26, 1929. Raskob did not know how the gain was computed. The gain calculated under the "first in, first out" rule and on the basis of identification of certificates is about $24,000 and $50,000, respectively, less than $458,400.

52. The transaction of January 27, 1930, was entered in the books of du Pont and Raskob as purchases and sales of stock.

53. The transfer of stocks between du Pont and Raskob on December 26, 1929, did not constitute real and completed sales, and at the time of the transfer, or within 30 days thereafter, du Pont and Raskob entered into a contract for the acquisition by each of substantially the identical stocks transferred on December 26, 1929.

54. After the stock market crash in October 1929, du Pont, in response to requests made upon him, rendered financial assistance to various persons whose accounts lacked sufficient collateral or who were otherwise in distress as the result of the crash. Loans approximating about $20,000 were made to two individuals, secured by stocks which included 308 shares of stock of Warner Brothers Pictures, Inc. On November 11, 1929, he guaranteed the brokerage account of E. F. Ferriday, then a departmental official of the du Pont Co., and like accounts of seven individuals which Ferriday had guaranteed. Purchases and sales could not be made in these accounts

by Ferriday and the other persons without the permission of du Pont. Ferriday deposited collateral with du Pont as security for the guarantee. The two classes of accounts aggregated about $1,200,000 in amount and were secured by stocks, including 4,400 shares of Warner Brothers Pictures, Inc. Du Pont's guarantee of the accounts continued until March 28, 1930.

On October 29, 1929, du Pont loaned $1,000,000 to the Nemours Corporation, a corporation owned by a niece of du Pont and her husband, J. Simpson Dean, for the purpose of partially liquidating stock brokerage accounts of the borrower and the Still Pond Co., a corporation owned by a sister-in-law of du Pont, other than accounts secured in whole or in part by stock of Warner Brothers Pictures, Inc. The loan was payable on demand with interest, and was secured by 333 shares of stock of the Delaware Realty & Investment Co., having a book value of approximately $6,000,000. On October 29, 1929, the Nemours Corporation loaned $246,000 of the money to Still Pond Co. without security. No part of the proceeds of the loan made by du Pont or the Nemours Corporation was used to pay in full or in part brokerage accounts involving stock of Warner Brothers Pictures, Inc., except $5,086.64, which payment was made at the close of 1929 merely for the purpose of closing the checking account of the Nemours Corporation in which the proceeds of the loan had been deposited. The Nemours Corporation paid its loan on January 30, 1930, with money borrowed from the Equitable Trust Co. on January 29, 1930, on the security of the stock deposited with du Pont as collateral. In November and December 1929, du Pont had some discussion respecting a loan to the Renappi Corporation, a corporation owned by a niece of du Pont and her husband, Donald P. Ross, but did not make one to it in 1929 or 1930. The business of these corporations was investments, oil and natural gas, and real estate. The three corporations owned 20,000 shares of stock of Warner Brothers Pictures, Inc., on October 29, 1929, and thereafter in 1929.

55. On January 3, 1930, substantially all of the petitioner's holdings of Warner Brothers Pictures, Inc., stock consisted of the 100,000 shares he had purchased from Raskob on November 13, 1929; the Nemours Corporation and the Still Pond Co. each held 7,700 shares of Warner Brothers Pictures, Inc., stock; the Renappi Corporation owned 4,600 shares; and the individuals whose stock brokerage accounts du Pont had guaranteed and to whom he had loaned money held 4,658 shares of the same stock. He had informed these parties that he was holding his stock in Warner Brothers Pictures, Inc. He had also so informed a Mrs. Nields, a friend who owned Warner stock and whom he was consulting with about investments. He had not rendered her any financial assistance. Du Pont took no

action to protect himself against a rise in the market price of Warner Brothers Pictures, Inc., stock between January 6 and 27, 1930.

Du Pont's reply to the second amended answer was signed by him and alleged, inter alia, that the "short sale was made as a hedge against losses petitioner would have sustained had the market value of the stock of Warner Brothers Pictures Company declined, by reason of financial support he had given to holders of 27,208 shares of such stock." On May 26, 1936, du Pont filed a motion for leave to file an amended reply. The motion was granted. The amended reply omitted the allegations in the original reply respecting the reason for the short sale.

56. On January 3, 1930, in the discussion between du Pont and Raskob as to sale of securities, which led to the sale made between them on January 6, arrangements were made for the form of a "short" sale of Warner Brothers Pictures, Inc., stock by du Pont to Raskob, of from 25,000 to 30,000 shares, the amount to be determined later. That day Raskob executed a demand note dated January 3, 1930, bearing interest at the rate of 6 percent per annum, payable to the order of du Pont, with the amount left blank, and left it with Garey with instructions to fill in the amount, computed at the rate of $40 per share, upon being informed by Frank A. McHugh, secretary to du Pont at Wilmington, of the number of shares of Warner Brothers Pictures, Inc., stock du Pont would sell to Raskob as a short sale, and then deliver it to du Pont. On January 6, 1930, when McHugh informed him that the transaction would be for 27,000 shares, Garey inserted the amount of $1,080,000 in the note and delivered it to McHugh. The short sale transaction was completed on January 6, 1930.

The low, high, opening, and closing prices per share of Warner Brothers Pictures, Inc., stock on the New York Stock Exchange January 3, 1930, were 39⅛, 41⅜, 39⅞, and 40¼, respectively.

57. The note for $1,080,000 recited that it was secured by 70,000 shares of stock of Warner Brothers Pictures, Inc. Raskob instructed Garey to deliver the collateral with the note, less 27,000 shares involved in the transaction in connection with which the note was executed. The petitioner and Raskob did not discuss the question of collateral for, or interest on, the note. No stock was deposited with the note as collateral. Du Pont considered the note good without collateral.

A search was made for the note in 1932 and 1935 at the request of revenue agents, and again in 1937 in response to a subpoena, but it could not be located and it was not produced at the hearing.

On January 3, 1930, Raskob owned 45,113 shares of stock of Warner Brothers Pictures, Inc., of which 40,000 shares were held by the Bankers Trust Co. as security for a loan. No other shares

were acquired by him thereafter until January 6, 1930, when he purchased 100,000 shares from du Pont.

58. Raskob on January 3, 1930, dictated the following letter to du Pont:

JANUARY 3, 1930.

Mr. PIERRE S. DU PONT,
 Du Pont Building, Wilmington, Delaware.

DEAR PIERRE: This is to confirm the purchase from you this date of 27,000 shares of the Common stock of Warner Bros. Pictures, Inc., at $40.00 per share, aggregating $1,080,000.00.

In payment therefor I enclose herewith my 6% demand note in the above amount, with collateral as recited therein.

Since this is a short transaction by you, I am for the time being charging your account with the above number of shares, with the understanding that upon my demand you will immediately arrange to transfer to my name the number of shares due me.

Sincerely,

[Signed] JOHN J. RASKOB.

The letter was signed by Raskob on January 6, after Garey had inserted the number of shares and the amount.

The transaction was entered in the books of the petitioner as a short sale. The journal entry in Raskob's books contains the following notation under date of January 3, 1930:

Bot from him 27,000 shares at $40. giving my demand 6% note in payment thereof with 70,000 Shs. Warner Bros. Common stock collateral.

59. The sales prices of Warner Brothers Pictures, Inc., stock on the New York Stock Exchange rose steadily after January 3, 1930. During the morning of Saturday, January 25, 1930, Raskob had a long distance telephone conversation with du Pont in Wilmington respecting the closing of the "short" sale transaction. Nothing was said during the conversation about the price for the stock. During the morning of January 27, 1930, Raskob informed Garey in Wilmington over the telephone from Florida, in the course of the same conversation referred to above in finding 46, as to purchase and sale of the stocks sold December 26, that du Pont had agreed on the 25th to close the transaction entered into on January 3, 1930, by purchasing the 27,000 shares of Warner Brothers Pictures, Inc., stock, and that the price would be $50 per share, and requested him to consummate the transaction on such terms; also that if the sales of both blocks of Warner Brothers Pictures, Inc., stocks were made, to pay his notes to du Pont, with interest to date. Garey on January 27 told du Pont of the telephone conversation with Raskob and the price of $50 fixed by Raskob. During the telephone conversation Raskob dictated a letter to Garey respecting the transaction with the intention that Garey should sign and deliver it to du Pont. Garey transcribed the letter,

dated it January 29, 1930, and sent it to Raskob in Florida by special delivery for signature. The letter read as follows:

Mr. Pierre S. duPont, January 29, 1930.
 DuPont Building, Wilmington, Delaware.

Dear Pierre: I am about to dispose of 27,000 shares of the common stock of Warner Bros. Pictures, Inc. If you are interested in the purchase of these shares at $50. per share, I will give you the privilege of purchasing same on this basis, this privilege to expire at noon tomorrow. If interested please note your acceptance on the copy of this letter enclosed and return to me together with remittance in the amount of $1,350,000.

If not interested, will you please arrange to transfer to my name the 27,000 shares of this stock which I purchased from you on January 3rd last, on your short transaction, in order that I may be in a position to make delivery thereof when I dispose of this number of shares as outlined in the preceding paragraph.

 Sincerely,

Garey dated the letter January 29, 1930, because he thought Raskob would sign it on that day.

60. On the same day Garey, in compliance with Raskob's request, prepared and forwarded to Raskob for signature the following letter:

P. S. du Pont, Esquire, January 27, 1930.
 DuPont Building, Wilmington, Delaware.

Dear Mr. duPont: Enclosed herewith is my check for $1,787,066.66 in payment of the following:

| | |
|---|---:|
| My note of January 3, 1930 in amount of_____ | $1,080,000.00 |
| Interest on above note at 6% to date_____ | 4,500.00 |
| My note of January 7, 1930 in amount of_____ | 700,000.00 |
| Interest on above note at 6% to date_____ | 2,566.66 |
| | $1,787,066.66 |

 Kindly return the above notes to me and oblige,
 Yours very truly,

61. Thereafter on January 27, 1930, Garey inserted the date "Jan. 27, 1930," and the amount of $1,787,066.66 in check No. 479 drawn by Raskob on January 10, 1930, to the order of du Pont, and delivered the completed check to du Pont in payment of the principal of and interest to January 27, 1930, on the notes. On or about January 29, 1930, Garey received the notes from du Pont. The note for $700,000 was received back bearing the notation "Paid in full Jan. 29, 1930 Pierre S. duPont."

62. Raskob signed the letters set out in findings Nos. 57 and 58 and returned them to Garey, who delivered them to du Pont. On January 30, 1930, du Pont wrote the following letter to Raskob:

John J. Raskob, Esquire, January 30, 1930.
 230 Park Avenue, New York City, New York.

Dear Sir: Referring to the option in your letter of January 3rd, I hereby exercise this right and enclose check in the amount of $1,350,000.00 to take up

by direct purchase twenty-seven thousand (27,000) shares of the Class "A" stock of the Warner Brothers Pictures, Inc.

 Very truly yours,

PIERRE S. DUPONT

[Signed] PIERRE S DU PONT

The check referred to in the letter was drawn on the Bankers Trust Co. on January 30, 1930, to the order of Raskob and was delivered by McHugh, acting for du Pont, to Garey on the same day.

63. On or about January 22, 1931, an attorney engaged by McHugh to examine transactions of du Pont during recent years to determine whether they were in proper order, advised McHugh that stock transfer taxes had not been paid on the transaction involving 27,000 shares of Warner Brothers Pictures, Inc., stock, and expressed to him the opinion that the above letter of du Pont contained certain errors. As a result of this information and advice, on January 22, 1931, du Pont wrote the following letter to Raskob:

JOHN J. RASKOB, Esquire, JANUARY 22ND, 1931.
 *230 Park Avenue, New York City, New York.*

DEAR JOHN: Through oversight, the necessary transfer tax stamps were not used on my purchase of twenty seven thousand (27,000) shares of Warner Brothers Pictures, Inc., "A" stock as of January 30th, 1930. I now enclose $574.00 in stamps to be attached to the document and cancelled.

While examining the same correspondence I find the date, January 3rd, is wrong, the correct date being January 29th. The word "option" is also incorrectly used.

 Sincerely yours,

Pierre S. du Pont.

[Signed] PIERRE S DU PONT

M/t
Encl.

Upon receipt of the letter and check Raskob purchased and affixed to du Pont's letter of January 30, 1930, stock transfer stamps in the amount of $540 and refunded the remainder of du Pont's check to du Pont. Stock transfer stamps in the same amount were also affixed to Raskob's letter of January 29, 1930.

64. The sale prices of Warner Brothers Pictures, Inc., stock on the New York Stock Exchange on the dates below shown were:

| 1930 | Low | High | Opening | Closing |
|---|---|---|---|---|
| Jan. 24 [1] | 50 | 51¼ | | |
| Jan. 25 | 50⅛ | 50⅞ | 50⅛ | 50½ |
| Jan. 27 | 50½ | 53⅝ | 50⅝ | 53⅝ |
| Jan. 28 | 52¼ | 54⅛ | 53½ | 52⅞ |
| Jan. 29 | 52⅞ | 54⅜ | 53⅝ | 53½ |
| Jan. 30 | 52¼ | 54⅛ | 53¾ | 53 |
| Jan. 31 [1] | 52⅝ | 53½ | | |

[1] Opening and closing prices not in evidence.

65. Du Pont's check for $1,350,000 and Raskob's check for $1,787,066.66 were mailed to the main office of the Bankers Trust Co. on

January 30, 1930, and were deposited by the same teller to the checking accounts of the petitioner and Raskob at the bank on January 31, 1930. The balance in du Pont's checking account at the Bankers Trust Co. on January 30, 1930, was $96,281.52. The balance in his call loan account at the bank on the same day was $11,200,000. The balance in Raskob's checking account at the bank on January 28, 29, and 30, 1930, was $2,356,095.12, including the money borrowed on January 3, 1930, for other purposes.

66. Entries for the transactions covered by the letters set out in findings Nos. 60 and 62 and the checks issued in connection therewith were made in Raskob's books on January 27, 1930, and in du Pont's books on January 30, 1930.

67. During the period between November 13, 1929, and January 30, 1930, the petitioner and Raskob had no dealings with each other involving the sale or purchase of stock other than the transactions involved herein.

68. Du Pont delivered to Raskob in connection with the January 6, 1930, and January 27, 1930, stock transactions the identical stock certificates reissued in his name for the stock certificates received from Raskob in connection with the November 13, 1929, and December 26, 1929, stock transactions, respectively. Raskob also delivered to du Pont the identical reissued certificates, with two exceptions as set forth in findings Nos. 31 and 51.

69. On January 28, 1930, du Pont purchased on the New York Stock Exchange, through a broker, six blocks of stock of the Anaconda Copper Mining Co. aggregating 5,000 shares at prices ranging from 73½ to 75 per share. The average price was $74.66 per share. The entry in du Pont's books for the purchase is dated January 27, 1930. Du Pont paid for the securities on January 29, 1930.

70. Du Pont maintained for each kind of security owned by him a ledger in the form of cards on which entries were made for the amount on hand at the beginning of the year and purchases and sales made during the year. A new card was made up for any class of security acquired during the year which he did not own at the beginning of the year. On November 13, 1929, du Pont owned, and had cards for, stock of Warner Brothers Pictures, Inc., and American International Corporation, and did not own or have cards for the other stocks purchased from Raskob on that date, but du Pont's bookkeeper entered all of the stocks on new cards. He purchased other shares of Checker Cab Manufacturing Co. stock on November 15, 1929, through a broker and his bookkeeper recorded the transaction on a separate card. At the beginning of 1930, when new cards were made out, the shares of American International Corporation and Checker Cab Manufacturing Co. stock du Pont had purchased from Raskob were recorded

on separate cards. By that time du Pont had disposed of the shares of Warner Brothers Pictures, Inc., stock recorded on his original card, and, accordingly, only one card was made up for that class of stock for 1930. Entries for the stocks du Pont purchased from Raskob on December 26, 1929, were made on cards then being maintained for the stocks.

71. On November 14, 1929, du Pont purchased 1,000 shares of each of the following stocks: General Motors Corporation, Anaconda Copper Mining Co., Baltimore & Ohio Railroad Co., and Kennecott Copper Corporation.

72. The following dividends were paid to the petitioner and Raskob on the stocks received by them in their November 1929, December 1929, and January 1930 transactions:

| Shares | | Dividend | To stock-holders of record— | Date of dividend check |
|---|---|---|---|---|
| | *To du Pont* | | | |
| 30, 000 | Simms Petroleum Co | $12, 000. 00 | 11/29/29 | 12/14/29 |
| 8, 000 | Checker Cab Mfg. Co | 2, 800. 00 | 12/16/29 | 1/2/30. |
| 2, 000 | National Cash Register | 3, 500. 00 | 12/30/29 | 1/15/30. |
| 500 | Otis Elevator Co | 1, 000. 00 | 11/27/29 | 12/12/29. |
| | do | 750. 00 | 12/31/29 | 1/15/30. |
| 1, 000 | Bank of United States | 1, 500. 00 | 12/18/29 | 1/2/30. |
| 5, 000 | Baltimore & Ohio Railroad | 8, 750. 00 | 1/18/30 | 3/1/30. |
| 14, 000 | Anaconda Copper Mining Co | 24, 500. 00 | 1/11/30 | 2/17/30. |
| | Total | 54, 800. 00 | | |
| | *To Raskob* | | | |
| 56, 500 | General Motors Corp | $42, 375. 00 | 11/23/29 | 12/12/29. |
| | do | 16, 950. 00 | 11/23/29 | 1/3/30. |
| 4, 500 | Kennecott Copper Corp | 5, 625. 00 | 11/29/29 | 1/2/30. |
| 6, 400 | E. I. du Pont de Nemours & Co | {6, 400. 00 | 11/27/29 | 12/14/29. |
| | | 4, 480. 00 | 11/27/29 | 1/4/30. |
| | Total | 75, 830. 00 | | |

The petitioner and Raskob received from each other, and of the amount received, paid the following amounts for stock transfer taxes in connection with the reissuance of the stock in their names:

| Du Pont | | | Raskob | | |
|---|---|---|---|---|---|
| | Received | Paid | | Received | Paid |
| Nov. 21, 1929 | $6, 260. 00 | $3, 772. 00 | Nov. 22, 1929 | $1, 149. 00 | $824. 20 |
| Dec. 27, 1929 | 480. 00 | 480. 00 | Dec. 26, 1929 | 1, 600. 00 | 1, 600. 00 |
| Jan. 6, 1930 | 944. 20 | 944. 20 | Jan. 7, 1930 | 5, 170. 00 | 5, 102. 00 |
| Jan. 27, 1930 | 1, 600. 00 | 1, 600. 00 | Jan. 27, 1930 | 480. 00 | 480. 00 |
| Total | 9, 284. 20 | 6, 796. 20 | Total | 8, 399. 00 | 8, 006. 20 |

When making delivery to du Pont of certificates for the stock involved in the November transaction, together with a check for $6,260 for stock transfer taxes, Raskob informed du Pont that some of them were in street names with stamps affixed thereto, and expressed a belief that the stamps could not be used in connection with the is-

suance of the stock in du Pont's name. Du Pont paid the entire amount to a brokerage firm to cover stock transfer taxes on the entire lot of stocks, but the firm used only $3,772 for that purpose. The broker refunded the unused amount to du Pont in March 1930. McHugh offered to make a refund to Raskob, but Garey declined to accept it.

73. In their income tax returns for 1929 filed with the collector of internal revenue at Wilmington, Delaware, in March 1930, the petitioner and Raskob claimed as deductions from gross income the following amounts as losses alleged to have been sustained by them in connection with their November and December 1929 stock transactions:

*Losses claimed by du Pont*

| Shares | | |
|---|---|---|
| 56,500 | General Motors Corp | $1,623,275.00 |
| 10,000 | Anaconda Copper Mining Co | 315,099.00 |
| 10,000 | Baltimore & Ohio R. R. Co | 247,542.55 |
| 4,500 | Kennecott Copper Corp | 75,612.50 |
| 6,400 | E. I. du Pont de Nemours & Co | 202,600.00 |
| 40,000 | Warner Bros. Pictures, Inc | 656,516.64 |
| | Total | 3,120,645.69 |

*Losses claimed by Raskob*

| Shares | | |
|---|---|---|
| 100,000 | Warner Bros. Pictures, Inc | $2,767,470.00 |
| 30,000 | Simms Petroleum Co | 578,525.00 |
| 8,000 | Checker Cab Mfg. Co | 318,266.01 |
| 14,000 | American International Corp | 340,590.00 |
| 2,000 | National Cash Register Co | 129,917.50 |
| 500 | Otis Elevator Co | 102,495.00 |
| 1,000 | Bank of United States | 114,580.00 |
| 5,000 | Baltimore & Ohio R. R. Co | 5,200.00 |
| 14,000 | Anaconda Copper Mining Co | 18,480.00 |
| | Total | 4,375,523.51 |

In his computation of the deficiency forming the basis for du Pont's petition herein, the Commissioner disallowed, under the provisions of section 118 of the Revenue Act of 1928, $1,174,596.98 of the losses claimed by du Pont.

In his computation of the deficiency forming the basis for Raskob's petition the Commissioner disallowed, under the provisions of section 118 of the Revenue Act of 1928, $464,897.30 of the amount claimed as losses sustained on the sale of Warner Brothers Pictures, Inc., and Checker Cab Manufacturing Co. stocks. At the same time he allowed the amount of $563,811.33 as a loss sustained in the sale of Anaconda Copper Mining Co. stock. The increase of $545,331.33 over the amount claimed by Raskob in his return resulted from adjustments made to the cost basis of the stock under the provisions of section 113 (a) (11) of the Revenue Act of 1928.

74. In their income tax returns for 1930 the petitioner and Raskob included in gross income and claimed as deductions therefrom the

following amounts as gains realized and losses sustained in connection with their January 1930 stock transactions:

*Reported by du Pont*

| Shares | | |
|---|---|---|
| 1,000 | Bank of United States | [1] $(7,500.00) |
| 14,000 | American International Corp | 82,250.00 |
| 100,000 | Warner Bros. Pictures, Inc | 925,000.00 |
| 30,000 | Simms Petroleum Co | 262,500.00 |
| 8,000 | Checker Cab Mfg. Co | 49,000.00 |
| 2,000 | National Cash Register Co | 30,750.00 |
| 500 | Otis Elevator Co | 41,500.00 |
| 5,000 | Baltimore & Ohio R. R. Co | 10,000.00 |
| 14,000 | Anaconda Copper Mining Co | 21,000.00 |
| 27,000 | Warner Bros. Pictures, Inc | [1] (270,000.00) |
| | Total | 1,144,500.00 |

*Reported by Raskob*

| Shares | | |
|---|---|---|
| 10,000 | Baltimore & Ohio R. R. Co | $109,600.00 |
| 4,500 | Kennecott Copper Corp | 43,132.50 |
| 6,400 | E. I. du Pont de Nemours & Co | 175,948.80 |
| 10,000 | Anaconda Copper Mining Co | [1] (27,500.00) |
| 6,500 | General Motors Corp | 109,362.50 |
| 40,000 | Warner Bros. Pictures, Inc | 458,400.00 |
| 27,000 | Warner Bros. Pictures, Inc | 270,000.00 |
| | Total | 1,138,943.80 |

[1] Loss.

Raskob reported no net income subject to normal tax or capital gain in his 1930 income tax return, and he paid no income tax for that year.

Du Pont's return for 1930 showed tax due of $8,180.85, which was paid. In December 1932 the Commissioner determined an over-assessment in the amount of $8,180.85, without making any adjustments in the amount of stock gains and losses reported by du Pont in his return. In January 1934 the Commissioner determined that there was a deficiency of $13,000.03 resulting from the inclusion in gross income of the amount of $140,990.65 received from the Simms Petroleum Co. Syndicate, and other adjustments. Du Pont consented to the assessment of the deficiency and paid the deficiency on April 1, 1934.

75. Du Pont and Raskob acted in concert in the sales and resales herein considered.

In addition to the above findings we adopt as findings of fact the stipulations upon this issue entered into by the parties in this proceeding, and in proceeding No. 69673, John J. Raskob, which by agreement, consolidating this issue with the same issue in that proceeding, have been filed herein.

The transfers of stocks by du Pont and Raskob to each other, on November 13, 1929, and December 26, 1929, did not constitute real and completed sales but were consummated by mutual agreement at that time for reacquisition of the stocks.

## OPINION.

The situation presented to us under this issue for examination and interpretation involves in brief two transactions between du Pont and Raskob in each of which they made reciprocal transfers to each other of stocks in large amounts, and later reacquired such stocks; together with a transaction in the nature of a short sale from du Pont to Raskob, at the termination of all of which transactions du Pont and Raskob each owned the same stock and stood in the same financial position to each other as in the beginning, except for a very small amount.

The facts involved in these transactions take on the following outline: On November 13, 1929, Raskob sold to du Pont seven blocks of various stocks in large quantities, totaling 155,500 shares, for $4,606,000, while simultaneously du Pont sold Raskob five blocks of stock totaling 87,400 shares for $4,582,750. Checks were given by each and were deposited together in the same envelope, Raskob not having bank balance sufficient to cover his check until du Pont's check was to his credit; these sales, of each and all of the same stocks in the same number of shares of each, were reversed on January 6, 1930, du Pont reselling to Raskob the same seven blocks of stock in the same number of shares and delivering the identical stock certificates issued to du Pont upon transfer by Raskob to him for a total price of $5,989,500, while at the same time Raskob resold to du Pont the same five stocks in the same amounts and, with one exception, the identical certificates issued to Raskob upon transfer to him by du Pont for a total price of $5,254,125. Raskob gave a demand note for $700,000 and a check for $5,289,500, while du Pont gave a check for $5,254,125, and the checks were deposited together, pursuant to agreement.

The process was repeated on December 26, 1929, and January 27, 1930. On December 26 du Pont sold to Raskob 40,000 shares of Warner Brothers Pictures, Inc., stock for $1,560,000, while simultaneously Raskob sold du Pont stocks in the Baltimore & Ohio Railroad Co. and Anaconda Copper Mining Co., totaling 19,000 shares, for $1,569,000, checks being deposited together in the same envelope, and the transaction was reversed on January 27, when du Pont sold Raskob back the same Baltimore & Ohio stock and Anaconda Copper stock, and Raskob resold to du Pont the same 40,000 shares of Warner Brothers, the checks again being sent for deposit together in the same envelope, Raskob's check being for $1,600,000 and du Pont's for $2,020,000. The identical stock certificates received upon transfer, as to Baltimore & Ohio and Anaconda Copper stocks, were retransferred to Raskob, while Raskob, in reconveying the Warner

Brothers stock, used certificates obtained from du Pont in the resale of January 6. At the same time, on January 3, 1930, that the matter of resale of the stocks sold on November 13 was discussed preliminary to the resale on January 6, 1930, arrangements were made (and likewise completed January 6) between Raskob and du Pont for du Pont to sell to Raskob "short" 27,000 shares of Warner Brothers, in addition to the 100,000 shares purchased from him on November 13 and resold on January 6. Raskob gave du Pont his note for $40 per share, or $1,080,000 (it is contended by petitioner and Raskob, and denied by respondent, who asserts no note was executed).

When on January 27, 1930, the sale made on December 26, 1929, was reversed, Raskob's secretary paid the note for $700,000 given January 6, and note for $1,080,000 dated January 3 given in the short sale transaction, with interest to January 27, and informed du Pont that the short sale transaction could be terminated by payment for the Warner Brothers stock at $50 per share. Raskob by letter gave du Pont until January 30 to make such payment and upon that date du Pont gave his check for $1,350,000, or $50 per share, for the stock sold "short" on January 3 at $1,080,000. Raskob's check paying the two notes (with interest) for $1,787,066.66 and du Pont's check for $1,350,000 were both sent on January 30 to the Bankers Trust Co. in New York for deposit and received for deposit by the same teller on January 31. The amount of Raskob's check, added to the previous checks from Raskob to du Pont, plus stock transfer taxes on stock in the amount of $9,284.20 and $54,800 dividends received by du Pont on the stocks held by him before return to Raskob, balance, except for $46.86, the amount of the checks by du Pont to Raskob plus stock transfer taxes on stocks in the amount of $8,399, and dividends of $75,830 received by Raskob on stocks before their return to du Pont. During the period between November 13 and January 27, du Pont and Raskob had no other dealings in stock with each other.

The respondent, as evidence of lack of reality and bona fides and of agreement for resale, affirms that, in line with the close relationship between du Pont and Raskob, they concocted a scheme to take losses, particularly in Warner Brothers stock, alternately; that arbitrary market quotations were capriciously selected by Raskob and du Pont for the sales; that actual market prices played no part; that sales made November 15, 1929, were antedated to November 13 to get the benefit of lower prices for loss purposes; that no actual funds were used, it being agreed that neither would be out the use of cash; that the sales to each other were intentionally made in almost the same amounts so that neither would lose cash; that their checks were matched and deposited together; that, pursuant to agreement at time

of sales, they resold to each other all of the identical stocks purchased from each other and the identical certificates issued therefor; that they used a pretended "short sale" transaction to balance the matter between them at the end, emerging only $46.86 apart upon cross sales totaling $29,766,754.86; that postdated checks and letters were used to reverse on January 27 the transaction of December 26; and that a note for $700,000 given by Raskob to du Pont in connection with the resale of January 6 was a sham, while one for $1,080,000 purportedly given by Raskob to du Pont on a "short sale" did not exist. To these charges du Pont and Raskob answered in effect that the close relation between du Pont and Raskob does not affect bona fides; that each transaction was separate and distinct; that market prices were used and not capriciously selected; that there is no significance in the fact that the checks were deposited together; that the short sale in January 1930 was an actual transaction not connected with the sales and resales; that based upon business reasons, intention or hope is not equivalent to agreement or option; that there was no approximate balancing when all factors are considered; that such apparent balancing is the result of notes given by Raskob to du Pont in good faith; and that the sales and resales were real, bona fide, and lacking in contract to repurchase.

In the consideration of this issue two principles are to be borne in mind: That the burden is in the first instance upon the respondent, who seeks increased deficiency, and that, because of the admitted purpose of avoiding payment of income tax in consummation of the sales and the admitted close relationship between du Pont and Raskob, the transactions involved are to be given close scrutiny. *Grace A. Cowan, Executrix*, 30 B. T. A. 296 (299); *Harold F. Seymour*, 27 B. T. A. 403; *Charles E. Mitchell*, 32 B. T. A. 1093 (1129, 1130); *Commissioner* v. *Hale*, 67 Fed. (2d) 561; *Sidney M. Shoenberg*, 30 B. T. A. 659; aff'd., 77 Fed. (2d) 446; certiorari denied, 296 U. S. 586.

*Final balance.*—Since respondent affirms, and petitioner and Raskob deny, that in these matters du Pont and Raskob were in approximate balance when all sales and resales were completed, and since on the theory that results are evidence of cause, such balance alleged is a pertinent circumstance aiding in the solution of the problem of intent, we think it well to give initial consideration to this contention. To respondent's charge, the petitioner and Raskob answer that the figure $46.86 claimed by respondent as the near-balance is altogether incorrect and misleading for the reason that it does not take into consideration the dividends upon the General Motors stock purchased by Raskob from du Pont, which dividends, though received by Raskob, were not retained by him, but (to the extent of $52,500) were paid over by him to Archmere, Inc. (hereinafter called

Archmere), wholly owned by Raskob's wife, to which on November 14 he transferred the stock producing the dividends. Tables are submitted by both respondent and petitioner. So far as receipts by Raskob and du Pont are concerned, the tables are in agreement—du Pont receiving from Raskob $14,883,400.86, while Raskob received from du Pont $14,883,354, a difference of $46.86. The only item of difference between the computations is the disbursement of the General Motors dividends of $52,500 by Raskob to Archmere and upon the view taken of this item the conclusion as to the contention depends. We can not agree with petitioner and Raskob that the disbursement of dividends to Archmere should be considered. Those dividends were payable to stockholders of the General Motors Corporation of record November 23. Raskob was such a stockholder. He admittedly received the dividends. The fact that, pursuant to a sale by him of the General Motors stock on November 14, he paid over to Archmere $52,500 as 50000/56500 of the $59,325 dividends received by him, which Archmere would have received, if a stockholder of record November 23 (which Archmere was not), is of no help here for two reasons—first, because we have no information as to the contract of sale of stock by Raskob to Archmere, and therefore know not whether it was entitled to receive dividends payable as of November 23, or whether they were merely given to Archmere; and, second, because we are here interested in the account between Raskob and du Pont, and not between Raskob and Archmere. What Raskob did with the dividends received, such as giving them or selling them to another, does not alter the fact that *as between Raskob and du Pont* the account at the end of all these transactions was approximately balanced. So far as du Pont was concerned or knew, Raskob was the recipient of the dividends. We therefore conclude that it is true that du Pont and Raskob were, with the exception of a small amount, in balance, and returned to their original positions after the resales and close of the short transaction in January. This conclusion, of course, goes only to the actual figures as affected by consideration of the dividends from General Motors, and not to the question of whether the "short" transaction was, in fact, for the purpose of balancing and not a separate matter. That question will be discussed hereinafter.

*Question as to antedating sale.*—On November 13, 1929, petitioner and Raskob sold stocks to each other. The prices of the stocks sold were lower by several hundred thousand dollars on November 13 than on November 15, and the losses claimed upon the sales therefore greater to that extent than would have resulted from sales at prevailing prices on November 15. Respondent contends and adduces evidence tending to indicate that the transaction was entered

into on the 15th, but antedated to the 13th. Such antedating petitioner and Raskob deny. We shall next consider this question.

There is undoubtedly much evidence in support of respondent's contention in this particular. A letter written by Raskob to his secretary states that he had "today" drawn check to du Pont for $4,582,750 for the stocks sold (naming them), and the letter was written and dated the 15th. The check written by Raskob to du Pont in payment for the stocks shows that the date has been altered from "12" to "13"; the book entries of the purchases from du Pont in Raskob's cash book show the date as November 15, but also a marginal notation "Bot. Nov. 13, 1929"; and ledger entries show evidence of change, now showing the date as November 13. Du Pont's check to Raskob bears the date November 13, but is numbered 247, whereas checks 244, 245, and 246 are admittedly checks written on November 13th and 14th, and the check stub book shows alterations in the numbers of check stubs 244 and 245; while on the back of stub No. 247 appears a detailed list of the stocks sold to Raskob, with total amount of check therefor, with a stamped deposit date changed in ink from November 15 to November 13; the two checks were deposited together on the 15th, the deposit tickets being in the handwriting of Seer, Raskob's New York office manager, but dictated by Raskob and by him put in one envelope, attached together, and sent to the Bankers Trust Co. for deposit, with a letter by Seer dated November 15. Raskob did not see du Pont's check earlier than late on November 14. No reason appears why the checks were not deposited until November 15. Greater losses in sales made within the market price of the day could have been "made" or recorded on the 13th than on the 15th. On the 14th Raskob wrote the Bankers Trust Co. approving its action in transferring to his collateral account 1,500 shares of American International, though it had been included in the sale to du Pont on the 13th. It is also true that du Pont's testimony as to the date of execution of the checks is equivocal and open to respondent's charge of lack of candor; for, when asked whether he received Raskob's check on November 13th, he stated that he "believed" the checks originated on the 13th; and, after stating that he signed his check and received Raskob's check, he was asked:

Q. Both on the 13th?
A. Both dated the 13th, yes.

Neither du Pont nor Raskob could remember anything definite about the location of the checks until the 15th. The change of du Pont's stub-book-cash book from "Nov. 15" to "Nov. 13" as date of entry of deposit of Raskob's check for $4,582,750 is plain—showing an attempt to make appear as deposited on November 13 a check which was not deposited until November 15. The price of 80 used for Bank of

United States stock was a market price on November 14, but not on November 11 or November 12; the price of 36 used for General Motors stock was a market price on November 14, but not on November 11 or November 12.

Opposed to such evidence, however, we find convincing indications the the transaction was agreed to on the 13th. Du Pont's check was dated that date, and the date of Raskob's check, changed from the 12th (which date was written by mistake), was the 13th; both Raskob and du Pont testified that their agreement was made on the 13th, identifying the date as the next day after a preliminary discussion while walking home from a meeting of the General Motors finance committee, the date of meeting was established as the 12th; the letters by du Pont confirming purchase and sale bear date of the 13th, and the sales prices of stocks, except that of Bank of United States and of General Motors, were within the price range of the 13th. The irregularity in number of du Pont's check, being later than checks of November 13th and 14th, was explained as because the check used was a counter check written at New York while his check book was in Wilmington, and the number was possibly obtained by telephone from his Wilmington office after the earlier checks 245 and 246, shown to have been written in New York, had been sent there for use. The original check 247 was introduced in evidence at the hearing, still pinned, unused, to the stub book. The entries in Raskob's books as to his purchases, originally appearing as November 15, but changed to the 13th, were explained as made in the books at the end of the month, after it was learned that the earlier, current, entries had been mistakes because of the mistake in Raskob's letter of the 15th in referring, erroneously, to his check to du Pont as being made "today", or on the 15th. A letter written by Raskob to his secretary on November 15 notified him that he had deposited a check for $4,606,000 as proceeds of a sale of securities "on November 13th."

We have carefully weighed the contradictory evidence on this point, both as above detailed and details which appear less important, and we conclude that the respondent has failed to show that the transaction was on November 15 antedated to the 13th. The burden is upon him so to do. It is true that it was greatly to the interests of the petitioner and Raskob that the sales be as of the 13th when prices of the stocks sold were low, rather than the 15th when they had mounted, and such self-interest as well as many circumstances lend weight to respondent's view, but we think that a fair review of all of the circumstances and evidence calls for the conclusion that there was no antedating. In particular, in addition to the evidence above mentioned, we are impelled to this conclusion by the fact that November 14 is the date upon a letter by du Pont's secretary to the Bankers Trust Co. transmitting for deposit Raskob's check for $4,582,750 in

payment for the stocks sold to him by du Pont. This letter is in nowise shown not to have been written on the day of the date it bears; its writing on that date is wholly inconsistent with the theory of antedating, unless it is also inferred that it was a false record, created to prove sale on the 14th or earlier. Such inference is not sustained by evidence. In addition, Raskob on November 14 sold 50,000 shares of General Motors stock to Archmere—the same stock purchased from du Pont. This letter, the sale to Archmere, and the fact that the alterations in book entries and in date of Raskob's check are so obvious as not reasonably to be the work of one seeking to conceal antedating, taken with other circumstances and the fact of burden here upon respondent, lead us to believe, and we hold, that the transaction of November 13 was not antedated from November 15.

*Earmarking.*—Respondent argues that the stocks sold in the cross sales were earmarked for the return which later transpired. He points to the fact that du Pont's office made up seven separate ledger cards (his ledger being a loose card system) for the seven stocks purchased by him from Raskob on November 13, including two cards for Warner Brothers stock and American International, as to which he already had ledger cards, on which, under his practice, he would have entered the purchases of those two stocks from Raskob; also that though du Pont on November 15, 1929, purchased Checker Cab stock, it was entered upon a ledger card separate from the one upon which the Checker Cab purchased from Raskob was entered, that in 1930 new cards were again entered for each of the stocks purchased in 1929, and not combined with other stocks in the same companies; also that certain symbols were put on such cards. A review of the circumstances fails to convince us that there was earmarking. If there was such intent between Raskob and du Pont to resell, as respondent contends, it is hardly reasonable to think that it was necessary for them to earmark the stocks. The five stocks which du Pont had not already owned necessarily under his system required new ledger cards. The other two were reasonably explained, and the symbols had no meaning indicating earmarking. There is nothing to show that Raskob did such earmarking as to either sale, no evidence as to du Pont doing so in the December 26 sale, and little to show it as to du Pont in the November 13 sale. We conclude there was no earmarking of stocks.

*Disregard of dividends.*—Respondent urges also that an apparent disregard of dividends on General Motors stock sold by du Pont to Raskob on November 13, paid a little later, and by them as directors of General Motors Corporation at time, he contends, reasonably known to be impending at time of sale, tends to show lack of good faith in the sale, on the theory that such dividend would have

affected the value of the stock, yet was disregarded by them. The sales price of the General Motors stock was $2,034,000; the dividends referred to were $59,325. The dividends amounted to $1.05 per share, while the sale price was $36 per share and on November 13 General Motors stock varied $3.375 per share. We consider this item comparatively so inconsequential that it can not reasonably be held to have affected the minds of the principals in this transaction.

*Ferriday sales.*—Another ground of attack upon petitioner's position is offered by respondent in alleged approval by du Pont of a transaction between E. C. Ferriday, a departmental official of the du Pont Co., and Ferriday's brother, wherein appeared agreement between the brothers to sell stocks for loss deduction purposes, and repurchase same. The circumstances relied upon so to prove approval are that du Pont could control the release and sale of E. C. Ferriday's securities, and that he did release the securities passing between the Ferriday brothers. This is not approval of resale between them, nor is it shown that du Pont knew of the agreement to resell at the time he released and authorized sale by E. C. Ferriday, or even that he knew the sale was made to a brother. The evidence on the matter consists of letters of later date, informing du Pont that the sale was made to the brother and about the agreement to resell. If du Pont had already known these facts, their statement in the letter would have been unnecessary. Similar transactions go only to intent; here, assuming knowledge by du Pont of a similar transaction between two other parties, this fact can not be considered as to intent, bona fides, or reality in the cross sales between Raskob and du Pont. We conclude this circumstance does not demonstrate lack of bona fides in the matters here under scrutiny between Raskob and du Pont.

*Alternate sales of Warner Brothers stock.*—Respondent argues that the matters here constituted one transaction, and that all acts were steps therein, in that there was an agreement between Raskob and du Pont that the former should take a loss in Warner Brothers stock in November, while du Pont should take such loss in December. There are indications in the record to support this charge. Losses in Warner Brothers stock were so taken, and in the second transaction, of December 26, Raskob realized only a small loss of $23,680, while du Pont realized a loss in stock of $656,516.14. There is no evidence that Raskob entered the December 26 transaction in order to establish losses. His participation in the December 26 matter thus appears as an accommodation to du Pont. Nevertheless, we think that the idea of agreement to alternate losses in Warner Brothers stock rests on inference, rather than evidence, and that proof of connection between the two sales of November 13 and De-

cember 26 (and corresponding resales) fails, so far as it rests upon agreement for successive taking of loss on Warner Brothers stock. Of course, mere lack of definite connection in Warner Brothers stock between the two sales-resales transactions does not mean that neither has any bearing upon the other.

Respondent also urges that the direction of various letters to New York, but actual delivery thereof in Wilmington, Delaware, and reference on one letter to enclosures registered, when in fact no enclosures were registered or mailed, but were delivered, is evidence of deceit in these matters. We do not think that conclusion follows, but rather that such handling of mail was a matter of office routine, without significance.

*Support of market.*—In answer to respondent's contention that the fact of private sale is indication of lack of bona fides and agreement to repurchase, petitioner and Raskob on their part contend that the reason for sale privately instead of through the market lies in the desire of du Pont to support the market and not to sell upon a market which he was supporting and was known to be supporting. The point is of importance to a clear consideration of vital issues here. It is obvious that sales privately made would be more subject to contract, arbitrary selection of prices, and balancing of accounts, than would sales through the market. In an ordinary sale through the market there would be no opportunity for the seller to contract with the purchaser for resale as a part of the sale agreement, the sale itself would be bona fide and attack upon it would necessarily involve proof of an independent contract or option to resell, whereas a private sale might be combined with a simultaneous understanding, agreement, or option to repurchase, or otherwise lack bona fides. If the fact of du Pont's desire to support the market and not sell upon it explains the fact of sales and resales privately rather than through the market, respondent's contention that the sales were privately made in order to facilitate arbitrary selection of prices and agreements in bad faith is negatived. Although du Pont's contention that he was supporting the market is somewhat weakened by the fact that on October 29 $25,800,000 of his call money was withdrawn from the money market, and his books, to which he refers in part as proof of the fact that he devoted some $20,000,000 to support of the market and of others, indicate that only about $15,000,000 expended in the market and about $5,500,000 thereof was expended in October prior to the 23d, when the stock market started to crash, it may be that when du Pont first approached Raskob on November 12, 1929, as to sale of stocks, he was actuated by a desire to realize losses without selling upon the market he was supporting. But when the whole transactions, of November 13 and December 26, and the attendant re-

sales, are considered as completed, it becomes apparent, we think, that desire to avoid selling upon and depressing the market does not explain what actually occurred. Though Raskob was approached as a purchaser, it transpired that he must, in order to be a purchaser, become also a seller, and the net result of all of the transactions is that Raskob sold to du Pont approximately the same amount of stock that du Pont purchased from him, and a far larger number. of shares.

Upon du Pont's own testimony, this would have been beneficial rather than harmful to the market, for he testified that a ready taker of stocks offered aids the market, whether the sale is at low or high, that it tends to keep the market prices up. Raskob and du Pont were ready takers in the sales made by each, and upon this testimony these transactions, if they had been put through the market, would have aided it. Moreover, du Pont testified that if he had made purchases above the low prices on November 13 on the market, it would have aided the market. He did in fact, purchase from Raskob at approximately $200,000 above the low of November 13, and under his testimony by so doing upon the market he would have strengthened the market to that extent. He testified further, referring to January 6 and his purchase of 56,500 shares of General Motors stock, that such purchase would have tended to strengthen the market rather than depress it, if he had bought the shares on the market. It therefore appears from a consideration of these transactions as actually consummated that they would have supported rather than have depressed the market; from which it follows that the fact that Raskob and du Pont consummated their transactions out of the market, and privately, is not explained on the theory of du Pont's desire to support the market. In short, there was no need, according to the testimony of du Pont, to keep the sales off the market after Raskob had agreed to buy and also sell stocks of approximately the same value to du Pont. These transactions would have supported the market. The explanation is not convincing.

*Arbitrary selection of prices.*—We come now to consideration of what we consider a vital question, that of choice of prices by the parties—the respondent charging that prices, though in general within the market, were arbitrarily selected in order to insure an approximate balancing of checks by the parties, and petitioner and Raskob responding that there was no such arbitrary selection, and reason for none. The testimony of the principals is not in accord as to what the agreement on November 13, 1929, was in this particular, but Raskob testified that his recollection on the subject was hazy, and we have found, from a consideration of all the evidence

and the most consistent view thereof, that the only agreement as to what prices should be was, as phrased by du Pont, "It would be the market price of the day, but as to what market price, at what particular time, we had no conversation." Later, du Pont testified that prices were not mentioned, but that "it was the understanding that it was to be within the market of the day." In fact, du Pont sold to Raskob at substantially the low of the day, actual low for three stocks, one-eighth of one point above low as to Kennecott Copper, and at 36, one-eighth *below* low for General Motors. Upon brief, without evidence in the record and contrary to the written stipulation, making belated reference to a publication contradicting the stipulation and apparently contradicting two other publications from which it is suggested the stipulated figures were taken, it is contended that the low for General Motors for November 13 was 36. The written stipulation will not be disregarded. The aggregate price of du Pont's sales was below the low of November 13 by $6,500. (One-eighth below on 56,500 shares of General Motors is $7,062.50, and one-eighth above on 4,500 shares of Kennecott Copper is $562.50, a net of $6,500 below low.) Raskob sold to du Pont in one case (Otis Elevator) at the high of the day, five points above the low, and from one to two points above the low as to all other stocks, except Bank of United States, which was not sold on the Stock Exchange at all, and not on the Produce Exchange on November 13, but was sold by Raskob at 80, and the price of which on the Produce Exchange on November 12 was from 82 to 85. The sales by Raskob (as to all stocks, except Bank of United States) were above the low of November 13 a total of $198,000. The testimony of the parties, and the arguments of respondent, are to the effect that du Pont sold at the low, but this is in the face of a written stipulation, above referred to, giving exact figures, which figures must, of course, prevail. Apparently the parties thought du Pont sold at the low. These being the facts as to prices used in the November 13 sale, what is the fair inference therefrom as to arbitrary selection of prices?

The petitioner and Raskob point out that approximate balance in the amount of the checks to be written by the parties could have been arranged by one or the other raising or lowering the number of stocks sold, that this may in fact have been done, that it was therefore unnecessary to manipulate or arbitrarily select prices and that therefore respondent has not proven his point. It is true that the matter of balancing of checks could have been arranged by arranging the number of shares sold and thus setting the total price; and that therefore it was, as petitioner and Raskob say, unnecessary to select prices arbitrarily in order to arrive at balance or approximate balance

of checks. But a deeper consideration is here involved. Though manipulation of number of shares would have balanced checks, it is also true that unless those shares were sold by both parties to each other upon a common basis, the transaction would not have been fair as between the parties—in other words, would not have been the act of two parties dealing at arm's length—which is the usual criterion, or at least an indispensable criterion of examination of the reality or bona fides of a transaction such as this. However much they arranged the matter of balancing of checks (so that Raskob could buy), if the stocks were not sold between the two upon some common basis, there would plainly not have been fairness between the parties and it would plainly not have been the usual act of ordinary men. It is not reasonable to think that men commonly sell their property without a decent regard for their profit, without a selfish regard for getting what it is worth. Human nature furnishes the evidence of the soundness of this statement. It is apparent, therefore, that if this transaction was bona fide, both parties would reasonably have desired to get what their property was worth and not make a sacrifice. A common basis with no advantage to either party might be the low, high, open, close, or average of the market of the day, or the price at a particular time of the day. Raskob and du Pont dealt with each other on none of these bases. Petitioner and Raskob suggest that it might have been the price of a certain time of the day, but as we have above seen, the testimony of du Pont shows that there was no discussion as to price or time of the day. Moreover, it appears that the prices at which Raskob sold were in each instance even numbers, no fractions appearing, and this is also true as to all stocks, except one, sold by du Pont. Stocks on the market are sold at eighths and the mathematical possibility of each and all of these twelve stocks, save one, having prices without fractions at any particular moment of the day is so infinitely remote as effectually to dispose of any such contention even without the evidence we have on that subject. These prices were not the prices at any one moment of the day. It was, of course, not necessary for the parties to deal upon the basis of the Stock Exchange. We have considered cases where sales were made without regard to the Exchange, but it is not reasonable to suppose that the two men here involved, very heavy investors in stocks quoted on the Exchange, would disregard it; and the evidence shows that they did use such basis, in agreeing that prices would be within the market range of the day. Moreover, ordinary men dealing in good faith would not reasonably deviate from prices which they could obtain on an established market. Such deviation would be indication of the unusual. It is true, however, that there is still another bona fide and fair basis of dealing, that is, upon fair prices, but obviously

price obtainable in the market is fair, and in considering men who buy and sell stocks to the extent shown as to these parties, it seems reasonable to hold that the only fair explanation of not taking a common denominator such as high, low, open, close, or average of the market would be what is known as the blockage rule, the effect of which is sometimes shown to be depressed prices of stocks sold in large quantities. It is not argued that such rule was in fact considered by the parties here, but it is obvious and we find that such blockage rule was not here used, for the reason that the two largest blocks of stock sold, General Motors and Warner Brothers, were, relatively speaking, priced practically as high as were the other stocks sold between the parties in much smaller blocks. Warner Brothers, far the largest block, 100,000 shares, was sold by Raskob at 31, one point above the low, whereas a number of the other stocks were sold at the low. Raskob also sold National Cash Register at one point above the low, while three other stocks were sold between 1⅛ and 2 points above the low. It is true that 56,500 shares of General Motors were sold, as above set forth, for one-eighth below the low for the day, but the difference is obviously not enough to indicate that these stocks in general, others of which were in blocks of considerable size (such as 30,000 shares of Simms Petroleum), were affected by, that is, depressed by, the blockage rule. Yet no other justification than the blockage rule can be found for deviation from some common base in market price, in selecting prices between Raskob and du Pont when they were agreed to be within the range of the market. There is no way to reconcile the prices received by du Pont with those received by Raskob. For some reason yet to be determined, various prices were variously selected for the different stocks which left du Pont at a disadvantage over Raskob of $204,500, upon the basis of the low of the day. Indeed, the fact that the Bank of United States stock passed at 80 when the stock was not sold on the market on that day indicates that in that case at least there was an arbitrary selection of price. For Bank of United States there was no price "within the market" on November 13. In fact, the price used was not even within the market for the previous day, November 12, which would on November 13 furnish the nearest market criterion. It is later argued that the price set on Warner Brothers stock for closing the "short" transaction was a price of January 24, selected because the parties discussed the matter on January 25, yet, on November 13, they did not select a price from November 12 for Bank of United States, though there was a price on November 12 to select—82 to 85. Yet 80 was selected. Moreover, on December 26 du Pont sold to Raskob on the low of the day, and Raskob sold to du Pont Anaconda Copper stock at the low, but sold Baltimore & Ohio stock at one-half point

below the low of that day, using 115, the closing price of December 24, the previous stock day. Why should he select one low and not the other? The price of Anaconda Copper was not the close of the previous day. On January 27 the sales prices used for Warner Brothers and Baltimore & Ohio stock were the low, while that of Anaconda Copper was above the low of the day. On the resale of January 6 the prices were not uniformly the low, since Bank of United States stock was sold one-half point below the low, while all other stocks were sold at the low. We are impelled to the conclusion that no common denominator, so to speak, of common or fair basis, fair to both parties, was used in arriving at the prices set upon the stocks sold between them on November 13 or on December 26. The selection of prices in such transactions must logically be either upon a basis in fact fair to both parties, or upon a basis of arbitrary selection. There is no alternative. Webster's New International Dictionary includes in the definition of "arbitrary": "Depending on will or discretion; not governed by any fixed rules or standard; discretionary; * * * Exercised according to, or based upon, one's own will or caprice." That is what each did here.

Why was a market price, consistent and fair to both parties, not selected? Why was a fair basis, considering the blockage rule, not selected? There must be some reason for failure to select a fair and common basis of dealing between these two parties. We can not escape the conclusion that it was because the parties were not interested as bona fide purchasers and sellers would have been in dealing at arm's length, in the prices at which the stocks passed. Certainly, judged by standards of ordinary business conduct in good faith transactions, more attention would have been paid to price and one party would not have an advantage of $204,500 over the other. Raskob had a bank account in the Bankers Trust Co. of less than $40,000 from November 12 to November 15. He had to have du Pont's check in order to cash his own. If du Pont's check had been $40,000 smaller than Raskob's, this transaction could not have occurred in the way it did. It would have been approximately $200,000 smaller, had he purchased on the same basis he sold. This was no ordinary transaction. Indeed, du Pont testified that it would not be customary procedure with him to pick out stock prices, yet the prices used show this to have been done. We are of the opinion that the selection of prices of stocks in the November 13 and December 26 transactions was capricious and arbitrary and on no common basis, and that it is a strong indication of lack of reality and bona fides in the transactions.

It is suggested, however, that the parties might well have simply traded stocks at an agreed price, and the transactions would have had exactly the same effect as the sales that actually occurred. But this

is to neglect the idea that a mere trade of these stocks which passed between Raskob and du Pont would not have been to the disadvantage of du Pont to the extent of $23,250 as it was on the basis of prices used by them, and at the low of November 13, would have been to du Pont's disadvantage by $181,250; at the high to Raskob's disadvantage by $150,350. Such a trade to the disadvantage of one party or the other, to such an extent, as evidenced by the market of the day, would not be the act of parties dealing in good faith and would patently smack of unreality. Moreover, the testimony shows that this sale was to be "within the market" so that it affirmatively appears that sale and not trade was contemplated. We think the idea of trade is not helpful, for to it must be applied the same yardstick of fair and common basis for values. For one party to benefit on a trade to the extent above seen would mean that one received a gratuity to that extent—a gratuity easily ascertainable by comparison with a standard of common market prices during the day. A trade would indicate the same disregard of pecuniary consequences as did the arbitrary selection of prices to the advantage of Raskob on November 13. Even if a check for the difference was given, the question of the size of that check would bring on the same question of common basis.

Another circumstance which should receive attention and consideration on this question of prices used and inference as to bona fides or reality is the indefiniteness of the agreement between the parties as expressed in the testimony of both. On the 12th of November they discussed and on the 13th they entered into an agreement of sale of more than $9,000,000 worth of stocks. The market was in a state of chaos, as Raskob expressed it. It seems to us that parties dealing at arm's length and in good faith in such amounts would have discussed and agreed upon a definite basis of sale. But there was no conversation as to prices or the time of day at which prices should be ascertained, but only that they should be "within the market." Such a wide latitude, in fact negativing completed contract, indicates a remarkable disregard of prices. Under the evidence, without previous conversation or agreement as to prices, except that they should be within the market of the day, du Pont writes and Raskob accepts letters containing prices variously selected, though always (with the exception of Bank of United States and General Motors at ⅛ below low) within the market of the day—indicative that such was the agreement and the only agreement consistent with the testimony. Is this not fair indication that the parties were not dealing as ordinary men in an ordinary transaction, but were willing for advantage to be had, one way or the other, limited only by the market of the day—and in fact not so limited, since Bank of United States and General Motors prices used were outside such market range? Since du Pont without previous conversation accepted prices giving Raskob $204,500 advan-

tage, is it not an indication that he intentionally, or from lack of interest in price, allowed Raskob to have this advantage? Indeed, neither du Pont nor Raskob knew until several years later that Raskob had sold to du Pont above the low, while purchasing from him at substantially the low. This plainly indicates that there was no interest in comparative prices. Ordinary men do not deal with each other in such fashion; nor do they, in transactions such as these, deliver large checks to the maker thereof for deposit for the payee. Though interest on deposits for two or three days is suggested as a reason for codeposit of checks in November, a difference of about $200,000 in values is seemingly of no importance to these principals.

When viewed as a whole, the circumstances here, indicating a disregard of profits or losses to the extent of approximately $200,000 between the parties, demonstrate a lack of interest as to prices of that which each sold to the other to such an extent as to indicate that what they were doing was not a real business transaction, was not intended to have the usual results and significance of a bona fide business deal.

*Risk of the market.*—Petitioner suggests the fact that the sales and repurchases were at the risk of the market as reason why the sales were bona fide. The strength of this contention, however, is affected by the consideration that if there was agreement or option to repurchase it would, under the language of section 118 of the Revenue Act of 1928, be immaterial as to whether the sale was to be at the risk of the market; and further by the consideration that the risk of the market would have been of no effect, if there was agreement to balance, and balancing of, the bank accounts between the two parties, since such balancing would wipe out the risk. Moreover, it is plain, even in the absence of agreement to balance, the weight of idea of the risk of market would be affected, if any losses which might be sustained in the risk of the market might reasonably be more than offset by the gains to the taxpayers by the deductions of the losses taken in the sales in the first instance. This whole series of transactions shows that considering the losses claimed upon these transactions, which losses total $7,496,169.20, the risk of the market offers argument of doubtful consequence in the consideration of the question of fact as to whether these sales possessed reality. With such large deductions as reward, the parties might very logically take the chance involved in risk of the market. When the two sales here were reversed (without considering the short sale or payments for stock transfer taxes), the difference between these parties was $283,125 (net loss to Raskob, not considering interest). The materiality of sale and resale at market prices and risk of market is seen as an almost irreducible minimum when it is realized that the

risk of the market may either benefit or harm the seller. Inasmuch as no one can be presumed to anticipate the market, it is difficult to see why the ordinary person should fail to sell for purposes of tax losses because of the circumstance of risk of market in repurchase. The possibility of gain seems to negative that of loss and leave such consideration almost, if not wholly, immaterial. Indeed, it would seem to be material only if it appears that the seller believed that the market was going to advance. It does not so appear in this case. Moreover, in a case such as the instant matter, where each party is buying from and selling to the other upon cross sales or reciprocal sales, it is apparent that an advance or decline of prices on the market will in general affect both parties in the same way. What either party might lose in his repurchase, he would in general logically gain in his resale. In such a situation, the risk of the market can not be considered as a real element in determining the fact of reality or lack of reality of the transactions. *Joseph W. Powell*, 34 B. T. A. 655; affd., *Powell* v. *Commissioner*, 94 Fed. (2d) 483, seems to go far in disposing of the idea that considerations of bona fides ordinarily applicable to sales and resales are affected by the fact of sales and resales at market prices, for in that case sales and repurchases were all at the market, but were found not to possess reality. To the same general effect are *Shoenberg* v. *Commissioner*, 77 Fed. (2d) 446 (449, 450); *Commissioner* v. *Riggs*, 78 Fed. (2d) 1004; *Chicago Title & Trust Co.*, 32 B. T. A. 249; *Commissioner* v. *Dyer*, 74 Fed. (2d) 685.

*Repeated codeposit of checks.*—One of the grounds of attack by respondent upon the transaction between du Pont and Raskob is that they matched their checks repeatedly in the amount of some $29,000,000 in order not to be out the use of money in consummating the losses. The facts are not in the main in dispute, and the difference is in effect only in the inferences to be drawn. Checks in amounts approximately the same were sent to the same bank, the 16 Wall Street office of the Bankers Trust Co. at New York. They were sent together on November 15 ($4,582,750 and $4,606,000), on December 27 ($1,560,000 and $1,569,000), on January 7, 1930 ($5,254,125 and $5,289,000), on January 27, 1930 ($2,020,000 and $1,600,000), on November 15, December 27, and January 27 being sent to the bank in the same envelope, and on January 7 being sent together by agreement. The checks deposited on January 31 ($1,350,000 and $1,787,066.66) were remitted on the same day and received by the same bank teller for deposit. The deposits of December 27, January 7, and January 27 were shown to have been made together by agreement; as to the others, actual agreement does not appear, and was denied by du Pont as of November 15. However,

Raskob dictated the deposit tickets of November 15 and wanted no slip about the checks getting to the bank together. His bank account was not on any of these dates (except January 27) sufficient to cash his check, without deposit of du Pont's. It was explained that, because of having borrowed certain funds in his account for other purposes, he in effect wished not to use in the stock transaction funds borrowed for such other purposes, and therefore gave a check for $5,289,000 and a note of $700,000 to make up the $5,989,000 involved in the sale of January 6. Without the borrowed money he could not on January 27, 1930, have cashed his check for the amount necessary for his purchase of that date without one from du Pont. The evidence is that in the January 6 transaction the idea of exchange of equal amounts of cash, and the desire not to lose cash, were in mind, and that in the January 27 transaction du Pont wished to conserve cash.

What is the fair inference from this fact of repeated codeposit of checks, in substantially equal amounts? Neither of the last two pairs of checks deposited January 27 and 31, respectively, were closely together in amount (January 27 being $2,020,000 and $1,600,000, difference $420,000, and January 31, $1,787,066.66 and $1,350,000, difference $437,066.66), but the difference between those of January 27 was approximately the same as the difference between those deposited January 31, working a near balance of the four checks, and, as already seen, the final balance as between du Pont and Raskob was very close. The conversation between du Pont and Raskob's secretary on January 27 relative both to closing the short sale and reversing the December 26 sale, the passage of Raskob's checks then, and retention of Raskob's check for his notes until deposit of du Pont's check, indicate well that in effect the four checks were being balanced. We think the weight of these circumstances, and the repetition, can not be disregarded. There was plain intent to balance amounts in November, December, and January in the checks earlier than the final pair, and this lends credence to the contention that in the final transaction there was also desire to balance. The repeated balancing indicates that at all times up to January 27 there was desire by the parties (as du Pont stated was his desire in the resale of January 6 and January 27) not to lose cash, but to conserve cash. The final result was that there was almost no net use of cash by the two parties. Logic demands that these repeated balances be considered circumstantial of the wish and agreement of the parties to keep to the same position, in cash; in the end they had returned to identically the same position as to stocks owned.

*Agreement for second resale.*—Similarity of action, particularly when repeatedly appearing, is a strong and legitimate proof of

intent. There is remarkable similarity here, not only in repeated codeposit of checks, in roughly balancing sales totals, but in manner of sale—each to the same other party, each pursuant to plan by one or both to save taxes by taking losses, and each time resulting in resumption by each party of his identical original position as to stock ownership, in minutest detail, as to each and every share of stock originally sold. It is logical, therefore, to compare other details of the two sale-and-repurchase transactions. What we discover in one obviously creates some inference as to the other otherwise similar transaction.

On January 13, Raskob left for Florida, where he remained until late in March. On January 10 he wrote letters which, if accepted by du Pont and used, would reverse the December 26 sale and place in both him and du Pont the original ownership of stocks then sold. The very fact of writing such letters raises an inference that he had some reason to write them. Cause precedes result. On that date Raskob set down in letter form, addressed to du Pont, a *confirmation of sale* to du Pont of the 40,000 shares of Warner Brothers stock, which du Pont had sold him on December 26; and, in a separate letter, a *confirmation of purchase* from du Pont of the 14,000 shares of Anaconda Copper and 5,000 shares of Baltimore & Ohio stock, all of which he had sold to du Pont on December 26. The letters named the stocks and the number of shares of each. Blanks were left for price per share and total price. Raskob testified that in his best recollection the date was left blank on both letters, and Raskob's secretary testified positively that the date was left blank. On January 27 the blanks as to price and total were filled in by Raskob's secretary, the total purchase price from du Pont being $1,600,000, and by du Pont from Raskob being $2,020,000. On January 27, in strict accord with these letters, checks in these amounts (signed by Raskob on January 10, amount blank, to du Pont payee) passed, were deposited together, as above seen, and the stocks were retransferred to the original owners. Notwithstanding the repeated unequivocal statement by Raskob's secretary that he, the writer of the letters at Raskob's dictation, left the date blank and on January 27, 1930, inserted "January 27, 1930", we have found as a fact and hold that the date was inserted at the same time the letters were written on January 10. The evidence permits of no other conclusion. Two witnesses, one from the United States Bureau of Standards, the other an examiner of government documents from the Treasury Department, having qualified as having had long experience in such matters, both using scientific instruments to examine the letters, testified upon the subject. Their strong and plainly careful statements are not seriously contested. No evidence was offered in rebut-

tal of their testimony. We find therefrom that the dates were inserted in the letters on January 10, 1930.

Concluding, as we do, that these reversing letters, except as to insertions as to price per share and total price (and postscript on one letter) were prepared, dated as January 27, and signed, all on January 10, within 30 days from the sale of December 26, we must decide the effect on that sale. Do they indicate an understanding or agreement to resell? If so, that sale established no deductible loss. Petitioner and Raskob, as above seen, on brief do not take the position of denying positively the dating of letters on January 10, and argue that it was reasonable for Raskob to so prepare the letters, and date them the 27th to preclude their use before January 26, which would thus bring him within the provisions of the "wash sale" statute; that hope or expectation is not agreement or option, and was solely in the mind of Raskob, and not of du Pont; also that the letters were written to show the authority of Raskob's secretary to act in Raskob's absence in Florida.

We can not so minimize this evidence. Considering that these parties had just retransferred to each other, on January 6, the purchases made in the earlier sale, November 13, the fact that on January 27 the papers prepared on January 10 and dated January 27 were actually used to fulfill, precisely, in detail, what was provided for by the letters on January 10, the close association of the principals, the close scrutiny therefore required, the powers of attorney left by Raskob and used on the 27th, the exact agreement, in detail, between the letters prepared January 10 and the manner in which both this and the earlier transactions were carried on and consummated, the fact that the *exact* date (the first day when the deal reversing the sale of December 26 could be closed without application of the "wash sales" provision), as well as that the exact stocks sold on December and resold January 27, were specified and listed on the letters on January 10, tends strongly to demonstrate that there was no reality or bona fide disposition in the sale of December 26, 1929, but that there was agreement between Raskob and du Pont for repurchase of the stocks then sold. To disregard these circumstances would be to close our eyes to the light of logic and reason. No fair cause appears for preparation of these letters on January 10, unless Raskob had ground to believe that they would be utilized. If Raskob was merely predicting the resale on January 27, he was a true prophet. It is not reasonable to believe under all the circumstances here that letters and checks are prepared in advance to close a transaction, involving millions, with another, without understanding with the other so to do. Justice is properly blind—but not so purblind as these parties wish us to be. This was no mere remarkably accu-

rate prediction by Raskob that on January 27 there would be reversal of the December 26 sale.

Petitioner contends that evidence of Raskob's acts in reference to the transactions on January 10 does not bind him. We can not so agree. These two men are shown to be interested together in two sales, including the sale of December 26, and its resale on January 27. They were by evidence other than the acts of Raskob on January 10 shown to be associated in a common enterprise, pursuing a common object—the reciprocal sale and resale of stocks for income tax purposes, and the evidence as to Raskob's acts is admissible as to both. *Shea* v. *United States*, 251 Fed. 440; *Hamburg-American Steam Packet Co.* v. *United States*, 250 Fed. 747 (765); *United States* v. *Pan-American Petroleum Co.*, 55 Fed. (2d) 753; certiorari denied, 287 U. S. 612.

Another circumstance throwing some light on this transaction, tending to show Raskob's expectation as early as January 6 that there would be retransfer of the December 26 matter, is as follows: On November 14, 1929, Raskob purchased 9,000 shares of Anaconda Copper Mining Co. stock from his wife. On January 6, 1930, he sold 9,000 shares to his wife. He had at that time 5,000 shares available for delivery to her, yet he delivered no certificates to her until he had received back the Anaconda Copper sold by him to du Pont December 26, when he delivered to her 7,000 of the identical certificates received from du Pont and 2,000 other certificates. He had, after the sale to her, and on January 8, delivered, out of the 5,000 shares then available to him, 3,000 shares to the Bankers Trust Co. as collateral instead of to Mrs. Raskob on the sale to her. This has the appearance of something other than an ordinary business transaction, for ordinarily stock sold would be delivered, if not on the next day, within some reasonable time. For some reason Raskob delayed delivery, obviously past any reasonable period for delivery, and then delivered the 2,000 shares he had at all times, and 7,000 received back from du Pont. This circumstance tends to indicate that on January 6 Raskob had reason to expect delivery of Anaconda Copper stock from du Pont. Results are evidence; he did receive such stock.

Considering all the evidence, we are of the opinion and hold that the sale of December 26, 1929, did not establish deductible losses, because of agreement at time of sale, or within 30 days thereafter, for the repurchase which was carried out on January 27. A conclusion that the sale of December 26 did not possess reality, but was subject to agreement for repurchase is not without effect upon the previous sale; for these two sales were too similarly conducted in all other respects for the doctrine of similar transactions not to apply between close associates, admittedly actuated by a tax saving motive on both

occasions. As to whether the sale of December 26 was in itself bona fide, and what the conclusion should be as to the sale of November 13, other considerations are yet to be examined.

"*Short*" *sale transaction.*—We come now to an examination of the "short" sale transaction of January 3, 1930. Respondent offers it as proving a balancing finally of the transactions between the parties; petitioner and Raskob contend that it was a matter in good faith, wholly unrelated to these issues. Petitioner originally pleaded that it was a hedge to protect him against losses he would have sustained had the market value of the stock of Warner Brothers declined by reason of financial support he had given to holders of 27,208 shares of such stock. This pleading was signed by du Pont, was later withdrawn, and the gist of the contention now made by petitioner and Raskob is that du Pont sold short to Raskob on January 3 to 6, 1930, in connection with the resale by du Pont to Raskob of 100,000 shares of Warner Brothers stock on January 6, an additional 27,000 shares to protect three companies and several people, who were, he felt, relying upon his advice, or at least upon the fact that he had been holding Warner Brothers stock, to keep their Warner Brothers stock; that he would have been embarrassed to have sold in case it went down and they suffered loss through reliance on his advice or example.

The change of petitioner's position on this point was not explained to our satisfaction. He signed the reply very definitely limiting the reason for short sale to self-protection against loss in decline of 27,208 shares of Warner Brothers stock held by those to whom he had rendered financial assistance. He was so uncommunicative about his reasons for so doing, according to Raskob's testimony, that Raskob himself did not know any details of petitioner's reasons for the short sale. Even the beneficiaries were not informed. Obviously then no one but petitioner could reasonably have been the source of information for the reply filed. Pleadings of this importance are not reasonably to be considered filed without the knowledge of, approval of, and information from the client. At the hearing, it was apparent that effort was made, not merely to corroborate petitioner's present position, as contended upon brief, but to prove the original allegations. But proof of the original allegations failed. He had rendered financial assistance to holders of only 20,058 shares of Warner Brothers stock. The $1,000,000 loan, though obtained in order to liquidate without loss and in orderly fashion in part the brokerage accounts of the Nemours Corporation and Still Pond Co., was not used for the purpose of liquidating accounts holding Warner Brothers stock, and testimony that it was paid off by sale of securities was corrected to show the fact that it was paid by a new loan from the Equitable

Trust Co., with the same collateral as the first, stock of the Delaware Realty & Investment Co. of a book value of $6,000,000 and an admitted value of $1,000,000 as collateral for the note. As to the accounts of other parties whom petitioner had assisted by guaranty of their accounts, he was secured by life insurance policies, stocks, and control of sale of stocks.

It was apparent, therefore, that financial support under such circumstances to holders of 20,058 shares of Warner Brothers stock could be no reasonable basis for selling short 27,000 shares of that stock. It was under these circumstances that the contention of advice as to Warner Brothers stock, not limited to beneficiaries of financial support, was made. We are convinced that it was largely an afterthought, and though of course the burden was not upon the petitioner in the matter, it goes gravely to the question of credibility and shakes our confidence in the theory now advanced, the facts and reasonableness of which we shall now examine.

Raskob gave du Pont his demand note dated January 3 for $1,080,-000 with a letter stating that it was for 27,000 shares of Warner Brothers stock at 40, with collateral as recited therein. No collateral was, in fact, put up. On January 27, the day of resale of the stocks sold on December 26 and exchange of checks for $2,020,000 and $1,600,000 for such stocks, Raskob's secretary gave du Pont Raskob's check for $1,786,066.66 to pay off, with interest, the note given for the 27,000 shares of Warner Brothers stock, and the $700,000 note given to close the resale of January 6. This check was held by du Pont until January 30, when it and du Pont's check to Raskob for $1,350,000 to pay for the 27,000 shares of Warner Brothers stock were mailed to the Bankers Trust Co. and deposited by the same teller there on January 31. The $1,080,000 note was not produced in evidence, the testimony given being that it could not be found, but the $700,000 note was produced. Respondent urges that there was no $1,080,000 note, that the whole transaction is a myth to cover balancing checks between the parties. We have reviewed this evidence in its many details, including the book entries where the transactions appeared on the books of both parties. There are undoubtedly strong circumstances which cast doubt on the reality of the transaction, such as discrepancies in the book entries, and the fact that the whole matter is shown closed on Raskob's books on January 27, although he had not yet received, and did not receive until January 30, du Pont's check for the $1,350,000. Particularly relied upon by respondent is the fact that the note for $1,080,000 was indicated by the book entries, as well as letter transmitting it, to be secured by 70,000 shares of Warner Brothers, when in fact it was not secured at all by any collateral. Du Pont could not remember seeing this note,

1250

but its existence was established by other evidence, and, after consideration of all the evidence, we are of the opinion that the note did exist and that these parties went through the form of a sale of 27,000 shares of Warner Brothers stock "short" from du Pont to Raskob, which short sale was closed on January 27 by payment of Raskob's note, and January 30 by payment by du Pont of $50 per share for the 27,000 shares of stock. The reality of such sale we have yet to consider.

The price of $50 per share, however, was not a price of the 27th, or the 30th, but was the low price of January 24. Why the $50 price was selected is not explained, except that Raskob, who "fixed" the price, to use his expression, said he felt that du Pont considered the matter consummated by a telephone conversation between them about the matter on January 25, and that $50 was then the current price. The two principals differ considerably in their versions of that telephone conversation, but agree upon one thing—that neither the price, nor date as of which price would be set, was mentioned. Of course, the low of the 24th was not in fact the current price on the 25th. The stock opened on the 25th at 50⅛. After the $50 low on the 24th it was never so low again during January. Moreover, by du Pont's version of the telephone conversation, he did not learn therefrom that he could pay money instead of delivering stock, and so learned only on January 27, from Raskob's secretary. It is not in dispute that the suggestion to close the short sale with cash was first made on the 27th and such closing was not in fact mutually agreed upon until the giving of du Pont's check for $1,350,000 on the 30th, for by Raskob's letter to du Pont of January 29 he was specifically given the "privilege" until the 30th of paying at 50, or delivering stock—which is further contradiction of the contention by Raskob that on the 25th du Pont considered the matter closed. In that event, no letter would have been necessary. Raskob's secretary computed interest on both the $700,000 note given in the January 6 resale, and the $1,080,000 short sale note to the 27th, and paid both notes on that day. Asked why he computed interest to the 27th, he said it was because Raskob told him to do so, to figure interest to the 27th if the sales were made on the 27th, that the interest on the note should stop when the sales were made. With Raskob paying interest on the note to the 27th and du Pont not giving his check until the 30th (under specific written option from Raskob), we can discern no reason whatever for fixing this price as the low of the 24th. If du Pont had, under the written privilege or option, delivered shares on January 30, they would have cost him on the market between 52¼ and 54⅛—a difference between *$60,750* and *$111,375* from the $50 price allowed him as of January 24. On the 29th, when the "privilege" was extended by

letter, the difference would have been between $77,625 and $118,125; on the 27th, when the price of $50 was orally discussed, the difference would have been from $13,500 to $97,875. To that extent Raskob gave du Pont the benefit of difference in market. Even the price of $50.50 at which the 40,000 shares of Warner Brothers stock was sold to du Pont on the 27th was not used. It is of course true that Raskob intended the letter which was dated the 29th to be dated the 27th when he dictated it by telephone, but that specifically gave du Pont until "noon tomorrow" to pay cash or deliver stock, but this of course definitely gave benefit of the market to the 28th, and, when Raskob signed and sent the letter on the 29th, he equally definitely gave du Pont the benefit of the market to the 30th, so such benefit can not be denied. We hold that the price was arbitrarily fixed, without regard to the market or actual value of the shares being paid for.

There still remains for consideration the question, however, as to whether the short sale transaction, though closed at an arbitrary figure, was a matter unrelated to the other sales between the parties, or whether it was used as a means of balancing between the two the bank differences arising from the sales and resales. It did, in fact, have that effect. The $700,000 owed by Raskob at the close of the transaction of January 6 was in part absorbed by the rise in the price of Warner Brothers stock between that date and January 27, upon which date du Pont paid Raskob $2,020,000 as against $1,600,-000 paid by Raskob to du Pont, a difference of $420,000. A profit of $270,000 was made by Raskob upon the short sale, thus approximately paying off the indebtedness of Raskob at the end of the closing of the first, or November 13 transaction, upon January 6. When interest to January 27 was added to Raskob's notes, the price of $50 fixed by him for du Pont to pay on the short transaction worked, except for $46.86, a balance between the parties. The respondent has the burden of proof, yet we believe and hold that the actual effect of working such balance, the arbitrary selection of the $50 balancing price on Warner Brothers stock for no reason at all convincing, the close connection between short sale and the resales, the failure to attach revenue stamps to the note or letter, and the whole manner in which the parties treated this short sale, would, if unexplained, clearly constitute a prima facie showing that the short sale was a mere vehicle to balance the accounts between these parties; and that the reality and bona fides of the form of short sale require explanation. The reason now given is not convincing. In effect, it is, as above seen, that du Pont felt himself embarrased in disposing of his 100,000 shares of Warner Brothers when certain others were taking his advice or following his example in retaining Warner Brothers stock. The explanation has no weight for the simple rea-

son that a short sale was not necessary for the protection of these friends—du Pont could simply have told them that he was selling Warner Brothers stock and they could have conducted themselves accordingly. Certainly this would have been a much simpler way of escaping such a situation, if du Pont felt it to be embarassing. He testified that he intended, if the stock went down, to tell them, and let them take the benefit. Why did he not tell them in the first place? The explanation, in fact, is in effect that du Pont was willing, in order to sell the Warner Brothers stock back to Raskob, to take the risk of a rising market (which in fact cost him $270,000) with no intent to profit by a lowering market. If true, this would strongly bear out respondent's theory of lack of bona fides in the sale in the first instance. No substantial reason is advanced why he should take such a loss, with no chance for gain. To this must be added the fact that the total number of shares of Warner Brothers stock, even including the three corporations, which is involved with all of the parties mentioned by the evidence, whose holdings he says he sold short, falls far short of the 27,208 shares originally alleged as the basis of du Pont's short sale, or the 27,000 shares sold "short", for it totals only 24,658 shares. By adding to the list one Mrs. Nields, du Pont lumps the total as 26,000 shares, but there is no showing whatever as to how much Warner Brothers stock she held. Though he mentions that he might have forgotten some other small accounts, we are unconvinced that these figures offer basis for a short sale of 27,000 shares. Moreover, du Pont testified that the sale was "to protect certain accounts which added up to approximately 27,000 shares", but his books show that he had no account with Mrs. Nields or the Renappi Corporation, holder of 4,600 shares of Warner stock included by du Pont in his estimate (though the other parties did have accounts on his books). This discrepancy, together with the discrepancy between the present contention and the original contention in petition signed by du Pont that it was as a hedge against losses he might sustain by reason of financial support given holders of Warner Brothers stock, causes serious question as to the real purpose of the short sale transaction.

Furthermore, du Pont could have closed this short sale at any time, and the stock went steadily upward throughout January at a loss to him of $27,000 per point, while at the same time his friends were gaining proportionately on their Warner Brothers stock; yet he did not terminate the short sale, but stood such loss until on January 27 the amount of Raskob's indebtedness to him became fixed by the resale of the December 26 sale. It was then apparent that Raskob owed him the $700,000 note growing out of the January 6 resale, less the $420,000 difference between the resale prices of January 27,

making a net indebtedness by Raskob of approximately $280,000. Considering interest and stock transfer taxes, the difference between Raskob and du Pont would be, within a few dollars, wiped out by the payment by du Pont of $1,350,000, or $50 per share upon the 27,000 shares of Warner Brothers stock. That precise figure was "fixed" by Raskob, and the short sale closed on that basis, a basis of the low of January 24, by check given by du Pont on January 30. Under these circumstances, was such closing a mere coincidence unrelated to the matter of final balancing between these parties? Why was du Pont's heavy loss on this short sale continued up to, but only up to, the time when the second resale between him and Raskob was closed, and then the short sale suddenly closed at an antedated price, almost precisely such as to work a balance between him and Raskob?

The short sale was indeed related to the resale of January 6, for not only did the resale then of 100,000 shares of Warner Brothers stock cause the short sale of the 27,000 additional, on petitioner's own theory, but without the repurchase of the 100,000 shares by Raskob he could not have put up with his $1,080,000 note to du Pont the collateral he ordered Garey to deposit, since on January 3 Raskob had only 45,113 shares of Warner Brothers stock, and 40,000 of this was already up as collateral with the Bankers Trust Co. Raskob necessarily, therefore, considered, on January 3 when he executed the note, that he would receive the 100,000 shares of Warner Brothers stock which he did receive from the resale of January 6. Without it he could deposit neither the 70,000 shares shown by his books, erroneously, to be placed as collateral, nor 43,000 shares, the difference between that amount and the 27,000 shares sold short by du Pont. Indeed, the casual manner in which this collateral was neglected tends to demonstrate the lack of reality in the short sale transaction, and that there was close connection between the closing of the short sale and the resale on January 27 is shown by the payment of notes in both transactions by one check, signed and partly written on January 10, and Garey's testimony that the note was to be paid if the sales were made on January 27, and if du Pont bought both blocks of Warner Brothers stock. On January 10 two checks were signed by Raskob in connection with the two letters postdated to January 27. The letters were for use in the resale. Only one check was necessary for that purpose. Obviously the other check was intended for the use to which it was actually put—paying off the two notes, $700,000 and $1,080,000. Moreover, Garey was so sure of the closing of the short sale on the 27th that he entered du Pont's $1,350,000 check on Raskob's books of the 27th, though the check was not even written until the 30th and Raskob's option to du Pont was open until the 30th. We can only conclude that the short sale and both resales were a part of the same transactions.

If the closing price had been set by du Pont instead of Raskob, a different complexion might conceivably be seen in this matter. Du Pont was losing steadily throughout January upon the short sale; yet he did not suggest closing, but Raskob, who had two notes to pay, made the request for closing—at a figure (of an earlier day) which would almost precisely pay those notes. It seems more than apparent that Raskob wished the short sale merely to pay his notes, had no desire to profit from du Pont above that figure—but that the figure required to pay the notes is the figure required to balance, almost exactly, their repeated reciprocal stock sales, and it thus is evident that Raskob wished from the short transaction only profit enough to balance the stock transactions. This matter was not handled upon a business basis, the basis of ordinary men dealing at arm's length, or it would have been closed at the price of the day of closing. The final closing day was January 30, though optional price was set on the 27th. Raskob's letter giving du Pont the "privilege" of closing on that day can not be nullified by a remarkable and fragile contention that the price was of the 24th because of a conversation on the 25th—when as above seen both principals agree that on the 25th price was never mentioned. Du Pont's check at 50 was executed January 30, when the low was $52\frac{1}{4}$, the high $54\frac{1}{8}$.

To hold that this is a mere coincidence between price necessary to liquidate difference between the parties and price fixed for the "short" stock would be, in our opinion, bordering upon absurdity. The tax upon our credulity is almost a surtax. We decline to subscribe to the idea of such a coincidence. It is suggested that the price of Warner Brothers might have gone down instead of up, and that therefore this answers the idea of a balancing transaction being the object of the short sale proceeding. It is true that the price of the stock might have gone down instead of up, but it is equally true that the parties took no chance of this working a bigger money difference between them than there was on January 6 for the reason that at any day or hour the short sale could have been closed and any gain by Raskob widening the balance between them could have been prevented. The parties, if desiring to work out a balance, had everything to gain and nothing to lose in the short sale transaction. If the stock went up sufficiently, it would eventually work out a balance between the parties, if a price was selected at a point to work such balance, after the final difference between them was ascertained at the end of the second resale; if it went down, a balance would simply not be effected, but a closing of the short sale immediately could prevent the difference between them becoming larger. The short sale was an available instrument which might balance the account between the two parties, without

any appreciable chance of increase of money difference between them.

It did result financially in a practical balance between the two parties. It arose upon petitioner's own theory only because of the sale of 100,000 shares of Warner Brothers stock. It was discussed and entered into at the same time with the beginning of consideration of closing up of the November 13 sale, upon January 3. It was closed, practically speaking, at the time of the closing of the December 26 transaction upon January 27. All the circumstances demonstrate clearly a close connection between these matters, a utilization of a short sale for balancing purposes. On no other hypothesis can a reason be found for the selection of $50 as the price of the Warner Brothers stock, which—no more, no less—would pay Raskob's notes and balance these two principals. In our opinion, upon consideration of the record, the short sale, though evidenced by a note, was intended to be what it actually resulted in, a transaction balancing in effect the accounts between the two parties as to the matters herein involved.

The short sale transaction as a balancing transaction, is, of course, evidentiary only as to the two reciprocal sales-and-resales here examined, and the reality or lack of reality thereof is not determined wholly by the balancing transaction. That is merely one circumstance throwing light upon the principal question. The parties might or might not have consummated real sales, without a provision for balancing. Without a balancing the sales and resales would merely be at the risk of the market, and to that extent, but to that extent only, and limited as it is as above discussed, indicative of good faith.

*Inconsistency.*—Were the actions of the parties in these sales transactions consistent with others? We find inconsistency such as to question reality of sale. On January 27, 1930, du Pont sold Anaconda Copper, to the extent of 14,000 shares, for 72½. He testified that at that time he was willing to conserve cash by selling the Anaconda Copper and any other thing that he was not especially interested in; yet on January 28 he purchased the same stock to the extent of 5,000 shares, at an average price of $74.66 per share. This sale is in fact entered on his books as of the 27th. Apparently then du Pont was interested in Anaconda Copper—yet sold it back to Raskob. Likewise, Raskob on January 6 sold General Motors stock back to du Pont, the exact amount that he had purchased from him on November 13, although he had to borrow 50,000 shares so to do and take 6,500 shares out of hypothecation. It is true that the borrowing was from Archmere, Inc., his wife's wholly owned corporation, but we are urged to regard the earlier transfer of the stock from

him to that corporation as a real sale, divesting Raskob of title. To the extent that it is so considered, Raskob was selling what he did not own back to its original owner, du Pont. There is accommodation in this, such as to indicate agreement so to do.

To this should be added the fact that on November 14, while the sale of November 13 was still incomplete, so far at least as cashing of checks was concerned, du Pont purchased 1,000 shares each of four of the same stocks he sold to Raskob—General Motors, Anaconda Copper, Baltimore & Ohio, and Kennecott Copper. Such a fact in some measure bears out respondent's thought that du Pont considered these stocks so desirable that he did not make a bona fide sale, but intended to reacquire.

In the first transaction, Raskob sold du Pont 14,000 shares of American International Corporation stock. This was on November 13, as contended by petitioner and Raskob and as above found by us. On the same day the Bankers Trust Co., to which Raskob was indebted, wrote him that they were transferring 1,500 shares of American International from his custodian account to be held as collateral on his loan; and the next day, November 14, Raskob, in response to that letter, wrote the Bankers Trust Co. approving this action in so treating and transferring the American International stock. Is such recognition and treatment of the stock as his own inconsistent with the contention of good faith and complete disposition in the sale on the 13th? Petitioner points out that Raskob was a busy man that day, and merely overlooked the change of ownership. We have above concluded that all of the circumstances indicate that the sale was in form made on the 13th and to that extent overruled respondent's contention as to this item of American International; but that was because of weighing other evidence, and it can not be denied that this action by Raskob on November 14 can not without explanation logically stand with bona fide passage of title to du Pont November 13. It is, of course, only one circumstance, but we think no reasonable explanation is suggested in mere lapse of memory on Raskob's part— in the course of one day. He had on the previous day sold seven stocks. Out of 14,000 shares of American International contributing to that transaction, we think he would not reasonably forget 1,500 shares. He must be presumed to know the fact that he was selling almost all of this stock which he owned. He had on the 12th or 13th of November checked over his stocks in order to find out what he should sell to take losses. With this checking so recent, he can not reasonably be found ignorant of the fact that he had only 14,324 shares of American International. We believe and conclude that there is here indication of recognition by Raskob of this stock as his own on November 14. Obviously this goes to the question of reality of sale.

We have now considered seriatim the principal elements entering into the consideration of our problem here. Upon consideration of all of them and of many details, each casting light upon the question, do they, taken all together, demonstrate, or negative, the conclusion that the sales herein considered possess that reality, bona fides, and freedom from agreement or option which is requisite within the purview of the law as to deduction of losses? We have concluded above that the second sale was subject to agreement to repurchase. Was it, aside from that fact, bona fide or otherwise; and what conclusion do the facts require as to the first sale? The question of reality or bona fides is under the facts herein, in effect, the same as the question of freedom from agreement for repurchase inhering in the transaction. *Foster* v. *Commissioner*, 96 Fed. (2d) 130.

Petitioner urges strongly that in our consideration here we are faced with categorical denials by du Pont and Raskob that there was any mala fides, lack of reality, or option or contract to reacquire. We have several times held that such statements, however, though material and important evidence in the matter, are not controlling merely because not equally positively denied by other evidence, but are to be weighed as other evidence of intent or purpose. *Rands, Inc.*, 34 B. T. A. 1094, 1102; *William C. De Mille Productions, Inc.*, 30 B. T. A. 826, 829; *Rand Co.*, 29 B. T. A. 467; affd., 77 Fed. (2d) 450; *Edward G. Swartz, Inc.*, 33 B. T. A. 355, 360.

There was formal transfer of the stock certificates involved. Apparent legal title passed in each case from each of the principals to the other for all stocks sold. But such formal requisites are not the only essentials to that reality and freedom from contract or option for repurchase which the revenue law requires of sales depended upon for deductible losses. Formal transfers in themselves do not conclusively establish intent, and surrounding circumstances may establish intent more clearly than parol evidence. We must examine the record. *Theodore C. Jackson et al., Administrators*, 32 B. T. A. 470 (477); *Wishon-Watson Co.* v. *Commissioner*, 66 Fed. (2d) 52; *Commissioner* v. *Dyer, supra; Harold B. Clark*, 2 B. T. A. 555.

Most of the many cases suggested to us are not of great assistance. In some, the resale involved was after a long period of time, such as almost a year, more than a year, three or four years later, as *John E. Lonergan*, 4 B. T. A. 1209; *Gray-Barkley Co.*, 11 B. T. A. 499. Other cases contain affirmative and convincing showing of lack of agreement between the parties. Thus in *Commissioner* v. *Neaves*, 81 Fed. (2d) 947, the owner at the time did not know of the sale which was made by her brother; while in *Charles E. Mitchell*, 32 B. T. A. 1093, the purchaser never saw or talked to the seller. In *Dwight C. Wheeler*, 32 B. T. A. 909, the petitioner supposed that his broker had sold to some member of the public, whereas in fact

the sale was made to the broker's nominee. Obviously, such cases negative by the circumstances in a convincing way the idea of any reservation, equivocation, evasion, or understanding between parties for repurchase. Of such a nature is *Marston* v. *Commissioner*, 75 Fed. (2d) 936. In other cases good reason for the resale later made is shown by the circumstances, sometimes change of conditions, and not merely by the asseverations of the parties. Thus in *Commissioner* v. *Hales*, 76 Fed. (2d) 916, a sale made in December 1926 was reversed in September-October 1927, because of a physician's advice to the purchaser to resell, and there was change of conditions in *A. H. Britain*, 20 B. T. A. 127.

In *Commissioner* v. *Dyer, supra*, there was considered a sale on November 30, 1927, and repurchase on January 3, 1928, of shares of stock. The repurchase was at a slight advance in price. The transfer was recorded and stamp taxes paid. The next year the same thing was done, the sale being made on November 30, 1928, and the repurchase on January 2, 1929. The sales in both cases were made for notes. The motive was, as in this case, the claiming of losses. The court with the above facts before it, said:

* * * In the case at bar, the inference is inescapable that "repurchase" of the stock by return of the notes was part of the original plan, and that from the beginning the transferors intended to reacquire their shares in this manner. Could any doubt exist, it is laid to rest by the repetition of the ritual in the second year. The association had the power through their complete control of Lamborn & Co., which in turn completely controlled the Elanco corporation, to carry out this intent. It is apparent they were acting in concert and had a mutual understanding that the transfers would be rescinded when the notes came due. Under these circumstances it is as though there had been an agreement between all the transferors and Elanco that the sale should be coupled with a contract, or at least an option, to repurchase. The transferors' ownership of their stock was not so completely terminated as to constitute the realization of losses by reason of sales.

It is to be particularly noted that the court stresses the "repetition of the ritual in the second year." Herein we have a repetition of the sale ritual about six weeks after the first sale, and a repetition of the rite of resale within three weeks after the first resale; and it would seem that repetition so close together is even more logically to be considered than in the *Dyer* case, and that the "inference is inescapable" even more in the instant case that repurchase was part of the "original plan."

The courts have under various circumstances recognized other acts of the parties of a similar nature as of importance in establishing intent in the act in controversy. In *Wood* v. *United States*, 41 U. S. 341, Mr. Justice Story considered the matter of invoices of imported goods fraudulently made to evade or defraud the revenue, and said:

Passing from this, the next point presented for consideration is, whether there was an error in the admission of the evidence of fraud, deducible from the

other invoices offered in the case. We are of opinion, that there was none. The question was one of fraudulent intent or not; and upon questions of that sort, where the intent of the party is matter in issue, it has always been deemed allowable, as well in criminal as in civil cases, to introduce evidence of other acts and doings of the party, of a kindred character, in order to illustrate ·or establish his intent or motive in the particular act directly in judgment. Indeed, in no other way would it be practicable, in many cases, to establish such intent or motive, for the single act, taken by itself, may not be decisive either way; but when taken in connection with others of the like character and nature, the intent and motive may be demonstrated almost with a conclusive certainty. * * *

\* \* \* \* \* \* \*

* * * But the objections taken are, first, that when the proof was offered, no suitable foundation had been laid for its admission, and that the cause was launched with this proof; and secondly, that the proof related to importations after, as well as before, the particular importation in question. We do not think either of these objections maintainable. * * * The other objection has as little foundation ; for fraud in the first importation may be as fairly deducible from other subsequent fraudulent importations by the same party, as fraud would be, in the last importation, from prior fraudulent importations. In each case, the *quo animo* is in question, and the presumption of fraudulent intention may equally arise and equally prevail.

This decision has been often followed, and later similar transactions considered upon the question of intent, motive, or design. Among such cases are *Castle* v. *Bullard*, 64 U. S. 172, 186 (a civil case growing out of a fraudulent sale) ; *United States* v. *Snyder*, 14 Fed. 554 (a criminal case of false returns by a postmaster) ; *Holt* v. *United States*, 42 Fed. (2d) 103, 106 (correlating authorities to same effect) ; *Schultz* v. *United States*, 200 Fed. 234 (citing *Bryan* v. *United States*, 133 Fed. 495 ; *Exchange Bank* v. *Moss*, 149 Fed. 340 ; and *Penn Mutual Life Insurance Co.* v. *Mechanics' Savings Bank & Trust Co.*, 72 Fed. 413, to the same effect).

Wigmore on Evidence, § 316, vol. 1, 2d ed., approves consideration of subsequent events as proof of intent. Section 371 applies the same principles to civil cases, and section 373 applies it to matters of similar contracts of sale, etc., by the same parties.

"A repetition of acts of the same character naturally indicates the same purpose in all of them." *New York Mutual Life Insurance Co.* v. *Armstrong*, 117 U. S. 591 (598).

In this connection, we notice in the language of the court in the *Dyer* case above especially, "It is apparent they were acting in concert and had a mutual understanding that the transfers would be rescinded when the notes came due." It is, we think, equally apparent that du Pont and Raskob were acting in concert here. Not only were they intimate associates in business and in the du Pont Co. and General Motors Corporation, but they had both been buying Warner Brothers stock, Raskob even buying for du Pont upon occasions, and upon one occasion in June 1929 being authorized to sell for du Pont. Under

these circumstances, we think that respondent's contention that they were acting in concert in the transactions of the sales and resales is borne out. The evidence before the court in the *Dyer* case upon which to predicate the conclusion of concerted action seems to be largely the fact of the retransfer; while here there appears not only such fact, repeated in identical form in a second transaction—but other circumstances which we have above reviewed, our conclusion being based upon the fact of retransfer as only one of the many particulars considered. We have above concluded that there was an understanding to reverse the sale of December 26, and with all the circumstances before us here, we think that both transactions require close consideration in view of the language of the *Dyer* case, that "it is as though there had been an agreement \* \* \* that the sale should be coupled with a contract, or at least an option, to repurchase", and the cases requiring consideration of implicit or implied agreements or understanding as indicia of bona fides or the lack thereof. *Gray-Barkley Co., supra; Charles E. Mitchell, supra.*

In *Joseph W. Powell, supra,* we pointed out that the only evidence in the record of intention was the party's testimony that he did not intend to reacquire any of the property, and his acts, and we said:

\* \* \* Sometimes the acts of an interested witness speak louder than his words. Such is the case here. \* \* \*

\* \* \* and the explanation which he gave for his three sudden changes of mind are not convincing. A change of mind in regard to reacquiring one stock would not be so difficult to understand, but three changes out of a possible three tax one's credulity, particularly in the absence of a good explanation. \* \* \*

We can not but compare the situation in the instant proceeding as to changes of mind on the part of the petitioner and Raskob with the changes of mind mentioned in *Joseph W. Powell, supra,* for herein also each party, though willing to sell certain blocks of stocks, thereafter changed his mind and repurchased each and all of them. This happened twice within a short period of time.

There is ancient authority, unnecessary of citation, for judging a tree by its fruits. The fruit of these transactions was found in a return of these parties to the *status quo ante* in minute particular, in stocks and bank account. If there had been one or two stocks involved, the matter might be differently viewed, even though such one or two stocks be found returned to their original owners, but where one party transfers to the other seven blocks of stock and the other transfers to him five blocks, and six weeks later this process is repeated with three other blocks of stock, most of said blocks being of large size (totaling 127,400 shares of stock transferred by and returned to du Pont, of a total sales price of $6,142,750, and 174,500

transferred by and returned to Raskob, of a total sales price of $6,175,000) and the identical certificates of stock (or equivalents reissued in the usual way upon transfer) are with two exceptions, finally found in the ownership of the original owner, the impact of logic that there was design in this whole creation is strongly felt:

We disapproved three changes of mind out of a possible three in *Joseph W. Powell, supra;* here, fifteen blocks of stock changed hands twice. Moreover, each change of mind was complete as to each share of stock in each block, and no more and no less. No part or share of stock in any block was retained as in *Foster* v. *Commissioner, supra,* where emphasis was laid upon the fact that deduction was disallowed of that part of the stocks resold, but allowed as to the part not retransferred. Our credulity seems taxed here far more than we thought in the *Powell* case.

The burden was, of course, throughout upon the respondent because this issue arose only upon petition for increased deficiency. We think the respondent established clearly a prima facie case. It was then encumbent upon the petitioner, as we held in *Joseph W. Powell, supra,* to explain in some reasonable manner the reason these men had for repurchasing from each other, each and all of these blocks of stock. Obviously, had there been no explanation, there could have been no denial of the respondent's claim. What explanation is offered?

Du Pont said that upon November 13, the reason he selected the stocks, particularly National Cash Register, Otis Elevator, and Bank of the United States, which he had never held before, was "largely because they were offered and I thought they were good stocks to own." When questioned as to why, if he thought they were good stocks to own, he did not keep them, he said: "I can't say why I didn't keep them", but that he had not decided in the meantime that they were not good stocks to own, and that he had no reason to think so, and still thought they were good stocks; also, that he had not since that time bought any of them. Referring to the resale on January 6, he said that he was interested in acquiring the General Motors stock and the du Pont Co. stock which Raskob had bought from him, and that Raskob wanted Warner Brothers stock. He could not say why the other stocks were retransferred. As to the resale on January 27, he answered in response to a question: "I am trying to decide how it came about." He said he was willing to take on the Warner Brothers stock when Raskob called him from Florida and to conserve his cash by selling other securities, the Baltimore & Ohio and the Anaconda Copper, and any other thing that he was not especially interested in (though he had apparently been interested in them when he bought them from Raskob on Decem-

ber 26 and was interested, surely, when he purchased that stock on January 28). Raskob on his part said that he was willing to resell the 56,500 shares of General Motors to du Pont when he asked for it, even though he knew it involved borrowing 50,000 shares from Archmere, that he thought Mrs. Raskob and he had 75 percent of their whole fortune, perhaps, invested in General Motors and du Pont Co., and that he felt it would be advisable to lighten their load, particularly as he was no longer actively connected with the General Motors Corporation, except as a director and member of the finance committee. This explanation is, to say the least, unconvincing, even misleading, for the reason that Raskob's position with the General Motors Corporation was no different in January than it had been in November, since he had resigned as vice president and chairman of the finance committee about the middle of 1928, and particularly because his books in evidence show that he had no General Motors stock, except 6,500 shares, being the 6,500 shares that he had received from du Pont on November 13 and had not transferred to Archmere, and no du Pont Co. stock, except the 6,400 shares he sold to du Pont. He had, in fact, shortly before that time transferred all of his General Motors stock, except said 6,500 shares, to his short account, balancing the short account, and leaving 6,500 shares in his long account until it was resold to du Pont. The very fact that he had to borrow 50,000 shares out of 56,500 in order to make the resale to du Pont shows that he was not in the main lightening his load in General Motors and that that was not the reason for selling same to du Pont. In du Pont Co. he was not merely lightening his load, but selling out completely. He does suggest liquidation of his indebtedness to du Pont as a reason for selling the 40,000 shares of Warner Brothers on January 27. The indebtedness to du Pont, however, consists of the $700,000 balance due upon the resale of January 6, and the $1,080,000 note owed on the short sale transaction, so that it is apparent that the reason for his resale on January 27 depends for its weight upon the reasons for the resale of January 6 and the short sale. Liquidating such indebtedness was simply liquidating the matters here involved. Counsel for du Pont in his opening statement said that reasons would develop for the repurchase of the stocks sold on November 13. Reviewing the whole situation, we must and do conclude that no reason of any weight was developed for the resales of the stocks sold.

As already suggested, the reality of these transactions required our examination, regardless of final balancing, which was only an evidential circumstance. Yet the final balancing, so consistent with the approximate prior balancing of checks in each of the transactions, is obviously and largely indicative of a desire that the status of these parties should not in sum change. They did return to their original

ownership; they did return to practically their original financial position with each other. Circumstances leading to results in these proceedings are such as to overbalance, in our opinion, the denials made that there was understanding between the parties affecting the sales. Indeed, the denials were not wholly so categorical as contended by petitioner. The parties are not altogether free from suspicion of mental evasion or equivocation at times. Thus, du Pont, when asked whether there were any other papers in the original transaction of November 13 other than the two letters (written by him), answered: "Well, they finished that transaction." Likewise, asked about other papers as to the January 6 resale, his answer was: "Not that I recall at the time. This is complete." The answers are remarkably similar as to the two transactions. Asked as to conversation as to possibility of resale (of November 13 sale), he answered, "Not that I remember. I believe there was not." Referring to the conversation with Raskob on January 6, 1930, when asked whether it was a mere coincidence that he selected the stocks he had previously sold to Raskob, his answer was: "No, I think I intended to do that and I agreed to do that." In other words, he agreed to do something—to select the stocks he had originally owned. When did he agree to do this? And a little later, when asked whether he did not want his own stocks back, "I don't know that they were my own stocks, not unless I bought them." Again, asked whether Raskob wanted his own stock back, he answered: "Evidently, he agreed to take them." It is true that later he explained that he was referring only to the transaction of January 6, 1930, and reiterated his denial of any previous agreement. Nevertheless, these statements can not be disregarded, but must be compared with the positive denials elsewhere found that the parties had agreement to repurchase. To disregard them would be to fail to give proper consideration to all the evidence. We conclude that the testimony was not wholly unequivocal or categorical in its denials. An inadvertent statement on cross-examination, or examination by counsel opposed in interest, is often more fruitful of the truth than broad statements in answer to one's own counsel. The eliciting of such statements is one of the prime objects of such examination. We think it was not devoid of result in this case, and that it can not be said that there is nothing in the way of admission by the parties tending to show mutual understanding as to repurchase.

To this must be added some attention to Raskob's 1930 income tax return, and the effect on credibility of witnesses of our conclusion that Raskob's letters of January 10 were postdated to January 27, contrary to the repeated positive statements by Raskob's secretary. In his 1930 return, Raskob reported the 10,000 shares of Anaconda Copper stock which were sold to du Pont on January 6

as being purchased November 14. This is contrary to the fact of purchase on November 13 as above found by us and contended throughout by petitioner and Raskob. The date was changed, in the 1930 return, in order to return incorrectly a cost basis of 78 for the stock, instead of the actual cost base of 70, because in the 1929 return the sale of 10,000 shares of Anaconda stock (out of the 14,000 shares sold to du Pont on December 26) was reported as on a cost base of 78 when in fact it was 70. In other words, the loss was claimed in 1930 when it might be and was actually needed, instead of 1929, when it was not, by incorrect report of the facts respecting the 10,000 shares sold on January 6. We have considered as unintentional errors many discrepancies in the book entries involved in these matters; but this one can not be so considered. It is a reflection upon bona fides. The positive testimony of Raskob's secretary as to dating the letters January 27 instead of January 10, as we find was the fact, necessarily affects our confidence in the testimony of this witness. Raskob himself testified that it was his best recollection that the dating was not written on January 10. It is impossible for us, in the light of the indubitable fact of postdating the letters of January 10, not to consider that fact in weighing other evidence. When we consider also the almost total failure to show reasons for the reversal of the sales, the divergence between du Pont's original reasons for the short sale and the reasons given at hearing, we can not but refuse to give the full weight desired by du Pont and Raskob to the statements denying agreement to reconvey. Men who believe themselves imposed upon, as the record herein indicates the principals in these matters to believe, are, perhaps naturally prone to color accordingly their views and their statements of fact, to an extent to which they might not go except under the smart of what they consider imposition.

We said in *Sydney M. Shoenberg*, 30 B. T. A. 659 (661), that:

* * * A sale must rest on a genuine intention to dispose of property without reservation or evasion of mind. What is in the mind of the parties is not to be determined solely by self-serving declarations or testimony of the party interested. It is pertinent to consider all the acts of the parties, the several steps employed, and all other related facts and inferences.

In this connection we note the language in *Powell* v. *Commissioner*, *supra*, where reviewing our decision, the Circuit Court of Appeals, considering the fact that there in a proceeding, as here, involving sales which were, as in the instant case, later reversed, the only evidence was Powell's testimony that he did not intend to reacquire and his acts, the court stated:

* * * The Board was not obliged to believe him for his testimony was belied by his acts in every one of the transactions, which showed that he had formed a plan for carrying out each transaction and that each was carried

out accordingly so as to leave him in the same position of ownership that he would have been in had the alleged sales or transactions not taken place.

The court further said, after remarking upon the fact that the petitioner was a highly interested witness, and the sole witness as to his intention at the time, that the Board was not bound to accept his testimony as true, "especially so under the circumstances here presented, as his testimony as to his intention does not accord with his acts but is in direct conflict with them."

It is true, of course, that in the *Powell* case the individual had no one but himself as trustee to deal with, whereas in the instant case there were two parties. Yet the decision of the Circuit Court does not rest upon this difference, but plainly upon the direct contradiction between the testimony of no intention to repurchase and in the main the fact of repurchase. Indeed, we do not find in that case the many circumstances which herein are added to the fact of repurchase, to bear out the conclusion of the court that "his testimony was belied." Here it should be particularly noted, in comparing these two cases, that the instant case is stronger in that it was done outside of the market, whereas in the *Powell* case the sale was upon the market; and in that the identical certificates passed in this case, with no such showing in the *Powell* case.

Cases involving merely sales by one party to another, with resale, and not cross sales between them, only approach in a degree and are not completely parallel with the instant case involving cross sales between two parties. The only cases, however, which involve cross sales which have come to our attention are those of *Carl P. Dennett*, 30 B. T. A. 49, and *A. H. Britain, supra.*

The *Dennett* case contains little, if anything, to show reciprocity between the husband and wife, but demonstrates rather two not extraordinary business transactions for good reason, at dates separated by a considerable period of time. The *Britain* case approves a reciprocal sale and reciprocal retransfer. We can not escape the conclusion that the *Britain* opinion is justified by a change of situation causing the repurchase, wholly outside of the contemplation of the parties at the time of original sale, and that the parties were not acting in concert. The *Powell* case is, we think, more applicable to our own, involving as it did repeated sales and repurchases of stock by mere steps in a plan to establish losses for income tax purposes. That sales and repurchases therein were between the individual and himself as trustee goes only to the question of reality of intent to retransfer, and when we have herein transactions admittedly for purposes of taking losses for income tax purposes between parties of close association and working in concert in the matter so completely as the evidence herein discloses, the mutual intent to resell

appears herein even more fully than in the *Powell* case. In that case there was denial, perhaps even more categorical than in the present case, and not so many circumstances, we think, to contradict the testimony, as we have found herein.

When summed up, our whole question is, as stated in *Commissioner* v. *Riggs*, *supra*, citing *Gregory* v. *Helvering*, 293 U. S. 465, one as to whether the transactions considered are such as the statutes as to deductible losses intended and contemplated, or were paper transactions to escape tax liability. The matter before us here required examination in the light of the ordinary actions and reactions of men, guided by criteria of reasonable human behavior in business transactions. So viewed, they demonstrate, in our opinion, the complete improbability of the asseverations of petitioner that the sales were bona fide, real, free from agreement to reacquire, in spite of the result—the complete return to original ownership. Such a result could conceivably be without design, but such a thing would be entirely too remarkable for belief. Men do not conduct themselves and accomplish the end as did these parties toward each other, and attain an end so advantageous to their fortunes, without a common understanding. This design was too complete to be without designer. The record before us bares its transparency, and though the respondent had, contrary to the usual situation, the burden of proof because of having raised this issue after proceeding was filed, in our opinion that burden was abundantly met. To reach a different conclusion would require us to be blind to fact and to place a premium upon ingenuity, rather than bona fides.

Upon consideration of all the evidence, we hold that neither of the pretended sales of stocks between du Pont and Raskob was a bona fide complete disposition thereof, and did not possess that reality indispensable to sales contemplated by the statute as to deduction of realized losses, but that both were contrived and consummated through mutual understanding and agreement between the two parties for the reacquisition of the stocks originally owned by each, by the reversal of the sales in the manner in which they were reversed, agreement in the first sale inhering as a part of the original plan and transaction, and in the second sale occurring at the time of the sale or within 30 days thereafter. That formula of tax escape can not be approved. The deductions of losses from such purported sales are therefore disallowed.

---

*Issue as to Payments to Christiana Securities Co. and Delaware Realty & Investment Co.*

Respondent asks for the disallowance of deductions originally allowed by him to petitioner for the year 1929 in the amount of $832,956. Petitioner contends that the deductions are proper under

section 23 (a), (b), and (e) of the Revenue Act of 1928 [2] under any of five grounds, as hereinafter considered.

### FINDINGS OF FACT.

The parties have filed a stipulation, known as "Stipulation of Facts No. 4," as to most of the detailed facts under this issue, and the facts therein set forth are adopted and made a part of the Board's findings of fact by reference, and only as much thereof will be set forth herein as is necessary to consideration of the question involved. In addition to the facts therein stipulated, we find as follows:

1. Throughout the years 1910 to 1915, the petitioner, Pierre S. du Pont, was treasurer of E. I. du Pont de Nemours & Co. (hereinafter referred to as the du Pont Co.) and during the greater part of this period was also acting president of that company. In 1915 du Pont became president of the du Pont Co. and held that position until 1919. In 1919 he was elected chairman of the board of the du Pont Co., which position he has since continued to hold. In 1919 and in 1929 du Pont devoted about one-half of his time to managing his investments in stocks of various corporations. In 1919 he made no material changes in his investments. In that year he sold some du Pont Co. stock.

2. Until 1910 the business of the du Pont Co. was essentially the manufacture of explosives. In 1910 the manufacture of pyralin and artificial leather were added. From the beginning of the World War in 1914 to its close in 1918, the military explosives business constituted almost the entire business of the du Pont Co. However, prior to the close of the World War, the company began in a small way to develop other lines of business, such as dyes, paints, and pig-

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) *Expenses.*—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

(b) *Interest.*—All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations or securities (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from taxation under this title.

 \* \* \* \* \* \* \*

(e) *Losses by individuals.*—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

(1) if incurred in trade or business; or

(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or

(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft.

ments. Since 1918 the company's activities have been directed toward the development and expansion of products other than military explosives.

3. The executive committee of the du Pont Co. functioned as the general manager of the company. In 1919 a new executive committee, consisting of nine men, was appointed. Each of the new members had charge of a specific branch or part of the company's business.

4. Prior to 1919 the du Pont Co. had a bonus plan for additional compensation of employees earning more than $400 a month, among whom were the executive committeemen. Upon the termination of the war, the company was faced with the likelihood of substantially reduced earnings. The officers of the company recognized that, if the prosperity of the company was to continue, new outlets would have to be found. It was felt that the bonus plan then in effect might be inadequate to compensate the new members of the executive committee, upon whom rested the responsibility for directing the du Pont Co.'s affairs. The matter of providing additional compensation for the members of the executive committee had been discussed at length among the officers of the company in 1919, and it was determined to bring the matter before the finance committee by means of a memorandum prepared by du Pont as chairman of the board. At that time Irenee du Pont, chairman of the executive committee from 1915 to 1919, and elected president in 1919, thought that "the earnings were going to pot and we were going to have an awfully thin time."

5. The policy of the du Pont Co., in which du Pont as one of the officers of that company believed, was to pay the key men of the organization adequate compensation, and if possible in a way to urge them to make the company prosperous by giving them a share in the profits.

6. The du Pont Co. did not, in December 1919, have available for sale to the members of its executive committee 9,000 shares of its stock, other than unissued stock. Its stock was not then listed on any exchange and was first listed on the New York Stock Exchange in 1921 or 1922. Laird & Co., brokers of Wilmington, Delaware, dealt in a small way in the common stock of the du Pont Co. during December 1919, and January and February 1920, purchasing a total of 299 shares and selling a total of 336 shares.

7. Du Pont sold 1,000 shares of du Pont common stock to each of the nine executive committeemen in December 1919 and received at the time of such sales $320,000 in cash from each of the committeemen, a total of $2,880,000. The price of 320 per share was arrived at as a result of a computation prepared by the treasurer of the du Pont Co., which was intended to show the net asset value of the

stock. Du Pont at that time considered $320 per share to be a fair price.

8. The petitioner did not enter into the transaction involving the borrowing of shares of du Pont Co. stock and sale thereof to executive committeemen of that company for profit, except in so far as he might benefit from the benefits accruing to du Pont Co. through his interest directly by stock therein, and indirectly by ownership of stock in the Christiana Securities Co., the holder of stock therein, and through his reversionary interest in the trusts he had set up as to 24,000 shares of du Pont Co. common stock.

9. The payments aggregating $832,956, made by petitioner to the Christiana Securities Co. ($690,744) and Delaware Realty & Investment Co. ($142,212) in 1929, were not ordinary business expenses of an investor managing investments; said payments were not payments required to be made as a condition to the continued use or possession for purposes of petitioner's trade or business of property to which petitioner had not taken or was not taking title, or in which he had no equity; they were not interest upon indebtedness paid by petitioner; they were not losses sustained during the taxable year 1929 by the petitioner in business; and they were not losses incurred during the taxable year 1929 by the taxpayer in transactions entered into for profit.

#### OPINION.

We abstract the facts pertinent to a consideration of this issue as follows: From 1915 to 1919 petitioner had been president of du Pont Co., and prior to that time for many years had been connected with and had been an officer of that company. During 1919 he ceased to be president and was elected chairman of the board of the company and has held that position since that time. At that time, as well as in 1929, he devoted approximately one-half of his time to the management of investments made by him in stocks of various corporations.

In 1919 he sold some du Pont stock, but made no changes of any material nature in his investments in that year. During the World War almost the entire business of the du Pont Co. was the manufacture of military explosives, but after the war the company was faced with the likelihood of substantially reduced earnings, and the officers recognized the fact that new outlets would have to be found if prosperity was to continue for the company. Irenee du Pont, who was chairman of the executive committee from 1915 to 1919 and in 1919 was elected president, thought in 1919 that the earnings of the company were in great danger and that hard times were ahead of the company. The company was managed by an executive committee, and in 1919 a new committee was appointed. The

policy of the company was to pay such men as executive committee-men adequate compensation, such as giving them a share of the profits to make the company prosperous. The finance committee in November 1919 submitted to the company's counsel a plan under which each executive committeeman would receive an annual salary of $30,000 in addition to a percentage of the annual net earnings, which earnings were to be invested in common stock of the company by the issuance to each executive committeeman of 1,000 shares of du Pont Co. common stock at $400 per share, to be held in trust for him until January 1, 1925, at which time he would be given a credit of $150,000 on the purchase price, he thus having a right to purchase the 1,000 shares for $250,000 in cash, subject to adjustments for interest and dividends. The company's counsel rejected the plan as to issuance of stock because of constitutional objections and the necessity of submitting the proposition to all stockholders.

The company did not have 9,000 shares of its stock available other than unissued stock. The stock was not listed on any exchange. In December 1919 the bid prices for the du Pont Co. common stock varied from $360 to $375 per share, asked prices being from $375 to $390 per share. At that time the authorized common stock of the company was 800,000 shares, with 588,542 shares issued and out-standing. The Christiana Securities Co. owned 183,000 shares, and petitioner owned 29,125 shares of the common stock of the 75,000 outstanding shares of the common stock of the Christiana Securities Co. The petitioner only owned 74 shares of du Pont Co. stock. He had created two trusts, holding a total of 24,000 shares of the du Pont Co. common stock in which he had the reversionary interest.

In December 1919 he sold 1,000 shares of the common stock of du Pont Co. to each of the nine members of the executive committee. This was done in order to recognize the good work done by them for the du Pont Co., to encourage them in further effort to benefit themselves and other stockholders by placing them in a position to share in the profits of the company, and in order to continue the plan of insuring good management of the company's affairs by enlisting permanently the services of able men through securing for them a personal interest in the company's success apart from salary compensation. The petitioner did not enter this transaction for profit, except such benefit as would accrue to him through his direct ownership of a small amount of stock in the company, indirectly through his ownership of stock in Christiana Securities Co., the owner in turn of stock in du Pont Co., and his reversionary interest in the 24,000 shares of stock held in trust. The du Pont Co. lent to the nine committeemen the sum of $320,000 each, totaling $2,880,000, on the security of the 9,000 shares of stock in that company which were put up as collateral, and the money was paid to petitioner at the

rate of $320 per share. Petitioner borrowed the 9,000 shares of stock from the Christiana Securities Co. on a 10-year loan, requiring him to return the stock in kind, but giving him title to the stock and the right to sell and pass title thereto, and requiring him to pay to the Christiana Securities Co. the dividends paid during the continuance of the loan on the du Pont Co. stock, or an amount equivalent thereto as and when dividends were paid. The contract under which the company lent to each executive committeeman the money to purchase the stock provided for interest at 5 percent and provided that all dividends paid upon the stock, put up as collateral, should be credited to the loan account of each committeeman. The price of $320 per share was considered by petitioner to be a fair price and was intended to show the net asset value of the stock.

By March 10, 1921, stock dividends received on each 1,000 shares, three at 2½ percent each, had increased the number of shares to 1,076 and the market price of the stock had fallen to $140, making the collateral worth $150,640, and each committeeman faced at that time a paper loss of $169,360 (aside from interest which had exceeded the cash dividends received on the stock). On April 1, 1921, petitioner wrote each of the nine executive committeemen, stating the reasons for the sale of the stock to them, which reasons have been hereinabove set forth, stating that the company needed able men more than it ever did; that it was important that the committeemen be free of worry over the unexpected outcome of their stock purchase; and that he, as a large stockholder and perhaps the one to be most benefited by the recovery in value of the company's shares, suggested that he would turn over to each of them 400 shares of the Christiana Securities Co. stock of an estimated net value of $160,000, that this stock be held by the du Pont Co. as additional collateral on the loan made to the executive committeemen, subject to petitioner's right to redeem the 400 shares by payment to the committeeman of $160,000 at the time of maturity of the loan made to him by the company (December 31, 1924), the $160,000 to be applied to payment of the loan if petitioner exercised this right to redeem, and, if he failed to redeem, the 400 shares of stock of the Christiana Securities Co. to become the property of the committeeman upon payment of the loan to the company, and the dividends declared on the stock up to $8,000 per annum to be paid to the committeeman, any dividends above that amount to be paid to petitioner; but petitioner to be bound to return to the committeeman all dividends received by him if he did not exercise the right to redeem. In effect, petitioner absorbed the paper loss which each committeeman had taken because of the depreciation in value of common stock of the du Pont Co. by giving him stock in the Christiana Securities

Co. (or money, if he redeemed the stock). Pet'tioner's proposal was accepted and carried out.

The du Pont Co. paid various stock dividends, .vhich, by several supplemental contracts between petitioner and the Christiana Securities Co., were added to the obligation of petitioner to return stock, so that by January 21, 1929, petitioner was under liability to return to the Christiana Securities Co. 142,212 shares of du Pont Co. common stock. On October 25, 1929, petitioner and the Delaware Realty & Investment Co. entered into a contract by which that company lent to him for 10 years 142,212 shares of common stock of the du Pont Co., the contract providing that the petitioner should pay to the Delaware Realty & Investment Co. an amount equivalent to all dividends paid upon the 142,212 shares of du Pont Co. stock, including any additions thereto by stock dividends or otherwise. To secure the loan, petitioner put up as collateral 7,320 shares of the common stock of the Christiana Securities Co. The loan was for a period of 10 years. With the proceeds of this loan, petitioner discharged the obligation to the Christiana Securities Co. and during the year 1929 he paid to the Christiana Securities Co. the sum of $690,744, being an amount equal to the dividends declared and paid upon the du Pont Co. common stock during the portion of the year 1929 prior to the discharge of the loan by the loan from the Delaware Realty & Investment Co., and during the remainder of that year he paid to the Delaware Realty & Investment Co. the sum of $142,212 as an amount equal to the dividends declared and paid by the du Pont Co. upon stock borrowed from the Delaware Realty & Investment Co.

Though the burden under this issue is upon respondent, the petitioner suggests the propriety of deduction under several grounds, and these will be discussed in order.

(1)—*Deduction as interest paid on indebtedness.*—The amounts paid by petitioner in 1929 and claimed as deductions were equivalent to the dividends received by his vendees upon du Pont Co. stock borrowed and to be returned in kind. The contracts whereby the stock was obtained by petitioner did not provide for payment of interest or refer to the payments as interest. The gist of petitioner's argument is that the word "interest" covers and includes compensation paid for forbearance in demand for payment of indebtedness and that an obligation to return in kind borrowed corporate stock is indebtedness within the purview of the statute. Undoubtedly there are cases to be found arising in the multifarious transactions calling for construction of the terms "interest" and "indebtedness", within the intendment of which can be found general authority for the views expressed by petitioner; but we have here a question as to the intent of Congress in a revenue act which

enumerates several deductions allowable to the taxpayer, among them interest paid upon indebtedness. Congress must be presumed to employ the ordinary meaning of words. That is the usual rule of statutory interpretation. *Levy* v. *McCartee*, 6 Pet. 102, 110; *Lynch* v. *Alworth-Stephens Co.*, 267 U. S. 364. The usual meaning given to the word "interest" is, in effect, money paid for the use of money borrowed. *Old Colony Railroad Co.* v. *Commissioner*, 284 U. S. 552. Such definition includes a restriction upon the term indebtedness to one in money. We believe that in its enumeration of deductions in the revenue act, Congress employed the words "interest" and "indebtedness" in that sense, and therefore that there is not includable within the connotation of the terms the payment of the equivalent of dividends received upon borrowed stock. We so held in *Gladys B. Terbell et al., Executors*, 29 B. T. A. 44; affd., 71 Fed. (2d) 1017, and we believe that the opinions there express a sound and workable view in the practical field of taxation, and that under this item of deductions there was intended to be included only the ordinary conception of interest as an amount paid for the use of money borrowed. We conclude and hold that the payments made are not deductible as interest paid upon indebtedness under section 23 (b).

(2)—*Deduction as ordinary and necessary expenses of trade or business.*—Does section 23 (a) of the Revenue Act of 1928, allowing deduction of ordinary and necessary expenses paid in carrying on any trade or business, authorize deduction of payments made equivalent to dividends upon corporate stock borrowed for sale to employees of a corporation, in which an investor owns stock, the sale being for the purpose of encouraging such employees and benefiting the corporation and its stockholders?

We shall under this and the succeeding headings of discussion of the deduction of these payments assume, without deciding, that the petitioner's occupation of an investor, managing, protecting, and conserving his investments, constituted a trade or business within the purview of the statute involved, for the conclusions to which we have come make decision of that question unnecessary. So assuming, therefore, we must decide whether the payments were ordinary and necessary expenses paid in carrying on any trade or business, within the meaning of the statute. Is an ordinary expense involved, if an investor engaged in managing his investments borrows 9,000 shares, of a value of $2,880,000, of a stock in a company in which he actually owns only 74 shares (even though indirectly he is interested to the extent of approximately 95,000 shares, about 17 percent of the total outstanding du Pont Co. stock) merely in order to assist an employees' stock participation arrangement for

the benefit of the company and indirectly for the benefit of his investment and that of other stockholders in that company? The borrowing was a part of a transaction in the nature of a short sale; yet the petitioner did not ordinarily enter into short sales. He testified, in effect, that he knew little about them. Even as in a short sale, the matter was obviously out of the ordinary, for the loan of stock was for a maximum of 10 years, and the stock was again borrowed for an additional maximum of 10 years.

Petitioner contends, however, in effect, that we should disregard the reasons for petitioner's entrance into the transaction involved, that is, the sale of stock to the executives of the du Pont Co., and that the borrowing of stock should be separated from the transaction of the company executives and viewed as an integer. This can not be done. The expense must be paid or incurred in trade or business—petitioner's business—which means that it must be not merely connected in some way with, but must be directly and proximately connected with petitioner's assumed business of an investor, managing investments. *Kornhauser* v. *United States*, 276 U. S. 145. Merely because he was such investor does not per se make any sort of borrowing of corporate stock in which he invests a part of his business, or make expense in so doing an expense incurred in his business; it might be in a transaction wholly unrelated to his business. It might be, for instance, a part of a transaction of donation to some eleemosynary institution and the basis for deductible contributions—patently without the requisite of proximate and direct business connection. Such necessary connection is here indicated, however, only by the fact that the stock borrowed was du Pont Co. stock, which stock in turn was one of petitioner's investments made in the course of his assumed business of investor, which investment he was managing, and by a showing that the borrowing was in itself a business transaction and not of some other nature. Plainly, this is not the necessary connection with petitioner's business. We therefore can not disregard the setting, the reasons for entering into the transaction for borrowing stock; to do so would leave before us a mere borrowing, isolated from the business which we have assumed petitioner to be carrying on. Yet, when we thus necessarily consider the setting and the reasons for the borrowing of stock and payment of the equivalent of dividends thereon, it appears that such transaction was not ordinary. Using that term in its common significance, although realizing that an expense may be ordinary, even though it does not often occur, we discern that the transaction here at hand was no ordinary matter, involved no ordinary expense in a business such as that assumed for the petitioner. This was no ordinary investment, but an extraordinary situation, which can not be allocated .

within the confines of the ordinary business of, or cause an ordinary expense of, an investor managing his investments. Plainly, an investor does not ordinarily find it necessary to encourage the employees or executives of a corporation in which he invests by borrowing and selling to them large amounts of stock for their encouragement. Indeed, the very fact that it was the petitioner, a stockholder, instead of the du Pont Co. itself (which had intended to encourage the executives, but could not constitutionally do so), thus encouraging the executives of that company, seems sufficient indication that the situation was extraordinary. We hold that, even though the expense incurred by petitioner in paying the equivalent of dividends upon the stock borrowed was a necessary expense in his business, it was not an ordinary expense. Respondent's contention on this point is sustained. We find it unnecessary, in view of this conclusion, to decide whether the expense was necessary.

(3)—*Deduction as rentals or payments for use or possession of property.*—The exact language of the statute has been quoted above. We think it is apparent that the payments here being considered, the equivalent of dividends on stock borrowed, were not rentals or other payments required as a condition to the use or possession for purposes of the trade or business of property to which the taxpayer is not taking title, or in which he has no equity, for we face the fact that the petitioner here did take title to the property— the corporate stock. The conditions of the borrowing specifically allowed him to sell the corporate stock, and he did sell it, receiving $2,880,000 therefor. To conclude that this taxpayer has not taken title or has no equity in the property would be plain disregard of the facts involved. Moreover, as pointed out by the Supreme Court in *Duffy* v. *Central Railroad Co. of New Jersey*, 268 U. S. 55, the word "rental" is to be taken in its usual and ordinary sense, while the phrase "or other payments" under the doctrine of *ejusdem generis* indicates payments of the same general character as rentals. The above case further decides that the ordinary and usual sense of the term rentals implies a fixed sum, or property amounting to a fixed sum, to be paid at stated times for the use of property, therefore not including payments uncertain both as to amount and time. The payment of the equivalent of dividends can not be brought within the meaning of the statutory language here relied on. On this point respondent's contention is sustained.

(4) and (5)—*Deduction as loss incurred in trade or business, or in a transaction entered into for profit, though not connected with a trade or business.*—Are the payments made deductible as losses incurred in trade or business, or in a transaction entered into for

profit? We have above held that the whole transaction of interesting du Pont Co. employees by sale to them of borrowed stock must be considered together, in order for the payments made to be connected at all with petitioner's assumed business of an investor, managing investments. When the matter is so considered, it becomes apparent that the petitioner made the payments involved here in the nature of an additional investment in his du Pont Co. stock—directly or indirectly held by him. The business being furthered was that of the corporation, and his interests were only indirect and in a relatively small amount in comparison with the interests of the corporation and the other stockholders. The business of the du Pont Co. was not that of the petitioner. *Burnet* v. *Commonwealth Improvement Co.*, 287 U. S. 415; *Western Maryland Dairy Corporation*, 32 B. T. A. 769; *Snider B. Ward*, 18 B. T. A. 326, citing *Margaret B. McLaughlin, Executrix*, 12 B. T. A. 19. See also *Dalton* v. *Bowers*, 287 U. S. 404, and *Burnet* v. *Clark*, 287 U. S. 410, which cases involve net loss deductible from income in a succeeding taxable year. It is true that the statutes there considered (section 206 (a), (b), Revenue Act of 1924, and section 204 (a), (b), Revenue Act of 1921) refer to a business "regularly carried on", whereas section 23 (a) of the Revenue Act of 1928 does not contain such expression; yet the principle involved is not essentially different in the cited case and the instant proceeding. These cases establish a line of cleavage between the business of the petitioner and that of a corporation in which he holds stock. In our opinion, this proceeding is governed by *Menihan* v. *Commissioner*, 79 Fed. (2d) 304; certiorari denied, 296 U. S. 651; affirming 29 B. T. A. 169; and *du Pont* v. *Deputy*, 22 Fed. Supp. 589. In the *Menihan* case the principal stockholder of a corporation had endorsed the corporation's notes and guaranteed its obligations. These he settled upon a 15 percent basis with no right of contribution against the corporation. He contended for deduction of the amounts paid as losses in business or in a transaction entered into for profit. Pointing out that the adjustment relied upon as creating the petitioner's obligations was but a part of the entire arrangement which saved both the corporation and the petitioner from bankruptcy, the court held that although the petitioner owned or controlled all the stock of the corporation, any loss in its trade or business was that of the corporation and not of the individual, and that losses in that business were deductible only from the income of the corporation itself. *Dalton* v. *Bowers, supra*, is cited. The court concluded that when endorsing the corporation's paper and guaranteeing its debts he was not in the endorsement or guaranty business, but clearly acted to protect his own previous investment; that when he discharged

the liability he was but preserving the value of his investment; and that the payments made were in the category of capital contributions made to help rehabilitate the corporation. We see no essential difference between the situation of petitioner here and the petitioner in the *Menihan* case. Each acted for the benefit of an investment he had made in corporate stock, and made payments in that connection. The du Pont Co., though obviously not in such difficulties as was the company in the cited case, nevertheless, under the record here was, after the close of the World War and the cessation of manufacturing of explosives for military purposes, facing a serious situation as to a continuance of its prosperity, and diverting its resources to other fields of business. Irenee du Pont thought the earnings were going to pot, and that they were going to have an awfully thin time. It was to help this situation that the executive committeemen were encouraged through the transaction here involved. As late as 1921, petitioner was of the opinion that the company needed able men more than it ever did. It is clear that assistance to and rehabilitation of the corporation, as the cited case phrases it, and therefore the preservation and enhancement of value of the stock of petitioner and other stockholders, was the motive prompting the transaction, common in both the cited case and herein. The court in the *Menihan* case denies the claimed deduction as loss sustained either in business or in a transaction entered into for profit, and in our opinion the same ruling is required here.

In addition, as to the profit transaction, the record herein is clear that the petitioner did not enter into the transaction for purposes of profit, except in so far as indirectly benefiting his stock in the du Pont Co., through his holdings therein and in the Christiana Securities Co., a large holder of du Pont Co. stock. The petitioner testified that he never stated that these transactions were entered into for profit. That he did not consider the short sale itself a subject for profit is demonstrated by the fact that in 1921 he did not take advantage of an opportunity to close it with a large profit, but, on the contrary, himself absorbed in effect the losses suffered by the executives. The decision in *Dart* v. *Commissioner*, 74 Fed. (2d) 845, only serves to accentuate, we think, the soundness of the view taken in *Menihan* v. *Commissioner, supra*, and although in the *Dart* case the petitioner was allowed a deduction as ordinary and necessary business expenses for charges to his account by brokers for dividends paid by them on stock certificates borrowed for delivery to purchasers in short sales, the decision points out that the taxpayer was engaged in the business of buying and selling securities, and refers to him as in the business of trading in stock. Petitioner, upon brief, particularly disclaims any claim to be a trader

in securities. We think it plain that the reason for decision in that case was that the short sales in which the expenditures were incurred were considered by the court as an essential and usual part of the petitioner's business. The court said:

It cannot be gainsaid that the expenditures in question here were usual in all "short" sales and that they were ordinary and necessary in that character of transactions. It seems to us equally clear that they were expenses paid during the taxable year in order to carry on the business of making the "short" sales, and were in no sense capital expenditures.

Such language and the expression of the court in the *Menihan* case that the petitioner there was not in the guaranty business indicate well, we think, that payments made by an investor for the indirect benefit of corporate stock in which he invests are not losses in his assumed business of an investor managing investments, nor losses in a profit transaction.

In *du Pont* v. *Deputy*, *supra*, the identical facts here involved were before the court, the only difference between the cited case and the instant proceeding being that in *du Pont* v. *Deputy*, only income taxes for the year 1931, growing out of payments to the Delaware Realty & Investment Co. was in issue, whereas here the relations of petitioner both to the Delaware Realty & Investment Co. and to the Christiana Securities Co. are involved. However, that makes no difference in principle. The court, after reviewing all the facts hereinabove reviewed, concluded that the business of Pierre S. du Pont was primarily that of conserving and enhancing his estate, that he embarked upon his course of conduct in the premises to the end that his beneficial stock ownership in the du Pont Co. might be conserved and enhanced, that he did not enter into the transaction with the nine committeemen, with the Christiana Securities Co., or with the Delaware Realty & Investment Co., for profit, and that he was not entitled to deduct from gross income the amounts paid to the Delaware Realty & Investment Co. as amounts equal to the dividends on the stock borrowed from that company. The same contentions were made in that case as presented here, the deductions being claimed under the five grounds above by us considered, and were by the court denied. Emphasis was placed upon the lack of approximate causation or direct connection between the payments to the Delaware Realty & Investment Co. and the business of the plaintiff and to the extraordinary nature of the expenditures. Quoting Mr. Justice Cardozo, in *Welch* v. *Helvering*, 290 U. S. 111, 114, the court observed, with reference to the course of conduct of plaintiff, that "There is nothing ordinary in the stimulus evoking it, and none in the response."

We hold that the deductions claimed by petitioner are not allowable under any of the headings under which claim is made and that they were improperly allowed by the Commissioner, and the Com-

missioner's contention that they should be disallowed is sustained. Deductions are a matter of legislative grace, and allowance thereof must be based definitely upon some one of the provisions of the statute. We find no provision in the statutes relied upon under which the payments made by the petitioner herein, as equivalent to dividends paid upon borrowed stock, to the lender of the stock, are allowable deductions. Whether provision for such a situation should be made is a problem for the legislative body and not for us.

---

## Issue as to Simms Petroleum Co. Syndicate.

The petitioner reported no income for the year 1929 from participation in the Simms Petroleum Co. Syndicate, and the respondent in determining the deficiency for that year did not include income from that syndicate. The issue here arises by virtue of respondent's contention that income from gains, profits, and income from the Simms Petroleum Co. Syndicate in the amount of $54,411.01 should be added to petitioner's income.

### FINDINGS OF FACT.

The facts on this issue have been fully stipulated by the parties as paragraphs 50 to 59 of Exhibit 2, together with the exhibits referred to in those paragraphs, all of which are made our findings of fact on this issue by reference and the facts will therefore be set forth herein only to the extent necessary for consideration of the issue involved.

### OPINION.

The Simms Petroleum Co. Syndicate herein involved was entered into by petitioner on or about May 29, 1929. The syndicate was to expire July 29, 1929, unless sooner terminated or extended. It was extended to October 28, 1929, by the manager under power given in the syndicate agreement, and by agreement with petitioner was successively extended to April 28, 1930, to July 28, 1930, and to the close of business October 27, 1930, at which time it was terminated.

Petitioner originally entered the syndicate to the extent of 25,000 shares (being 5 percent of the syndicate, if fully subscribed), but by letter of November 7, 1929, took over an additional 25,000 shares as to which certain other of the original participants refused to extend the life of the syndicate.

By letter of February 12, 1934, to the Commissioner of Internal Revenue, petitioner consented to the levying of an assessment in the amount of $13,000.33, resulting (in addition to certain adjustments) from the inclusion in his 1930 taxable income of items of income from the syndicate during 1930, such items totaling $140,990.65 as petition-

er's proportionate share of income from the Simms Petroleum Co., Syndicate for that year. This amount did not include any profits, dividends, or interest received by the syndicate during 1929.

The petitioner on brief states that he presents no argument against the position taken by respondent on this point, believing that such position, in the light of the decision in *Mark L. Gerstle*, 33 B. T. A. 830, and authorities therein cited, is probably correct. The position of the respondent is, in effect, that the syndicate here involved is not an association taxable as a corporation, but that the petitioner as a participant therein is taxable upon his proportion of the net profits, and is to be allowed his proportion of the net losses of the syndicate for the taxable year.

For convenience in consideration, the syndicate agreement is set forth in the margin.[3]

[3] *Private and Confidential*

M. J. MEEHAN & COMPANY
SIXTY-ONE BROADWAY
NEW YORK
SIMMS PETROLEUM COMPANY
Syndicate

NEW YORK, May 23, 1929.

Mr. PIERRE S. DU PONT,
*Room 3031, 230 Park Avenue, New York City.*

DEAR SIR: On April 30, 1929, I formed a Syndicate to purchase, sell and generally deal in the shares of the stock of the Simms Petroleum Company, a Corporation organized under the Laws of Delaware (herein termed Company) in which I will participate, and of which I am to be the Manager. The commitment of the Syndicate shall not at any one time exceed Five Hundred Thousand (500,000) shares either Long or Short; and all transactions for the account of the Syndicate shall be in accordance with, and subject to the rules and regulations of the New York Stock Exchange. I have reserved for you, subject to your immediate acceptance being received by me, a participation in this Syndicate of 25,000 shares as your proportionate share of the maximum of Five Hundred Thousand (500,000) shares.

Messrs. M. J. Meehan & Company, in consideration of a ten percent (10%) payment of the net profits realized on the consummation of this Syndicate (said payment to be made prior to the distribution of the profits of said Syndicate among the Participants) which I have agreed to pay them, have consented to act as my Agents in the transaction. The Account will be carried on the books of Messrs. M. J. Meehan & Company, and will be known as "Simms Petroleum Company Syndicate."

Participants shall pay $10.00 (Ten Dollars) per share on the number of shares of their respective participations at the time this agreement is signed, and the balance or any part thereof when called upon by the Manager, whether at or before or after the termination of the Syndicate, and without reference to the receipt or possession by the Manager or by the Participants of any of such shares.

I shall have full power to purchase, sell, repurchase, resell and generally deal in the shares of said Company, at such prices and upon such terms, and to pay such commissions for effecting sales or purchases for the account of the Syndicate as I may deem advisable, which I am hereby authorized to do.

I shall have sole direction and management of the Syndicate with full power to appoint and employ brokers and may delegate to them any of my powers or duties hereunder, and shall carry on the same in such manner as I may deem advisable, and shall not be liable under any of the provisions hereof, nor for any matter connected herewith, except for want of good faith. No obligations, not expressly assumed by me under this agreement, shall be implied therefrom.

I shall have the right to borrow money, either from Messrs. M. J. Meehan & Company or others, for the account of the Syndicate, and as security for any loan or loans so made, to assign and pledge any shares of the Company held for the account of the Syndicate or

Upon consideration of the terms of the syndicate agreement and other facts stipulated, we are constrained to hold that the syndicate was not an entity taxable as a corporation, but was a joint venture. The syndicate undoubtedly possessed characteristics of an association taxable as a corporation, within the guides laid down in *Morrissey* v. *Commissioner*, 296 U. S. 344; *Swanson* v. *Commissioner*, 296 U. S. 362; *Helvering* v. *Coleman-Gilbert Associates*, 296 U. S. 369; and *Helvering* v. *Combs*, 296 U. S. 365. Thus there was centralized management of an enterprise for profit, assignability of interest of participant, and continuity of enterprise regardless of continued participation by a particular member; and the instrument specifically recites that a partnership is not formed. It is plain that there was neither partnership nor trust. But in other respects we think the syndicate fails to bear the necessary resemblance to corporate organization such as to require treatment for tax purposes as an association. There

---

any of the obligations of the Participants hereunder, upon such terms and conditions as I shall deem for the best interests of the Syndicate.

. Nothing herein contained shall constitute the Participants partners with the Manager or with one another, nor render them liable to contribute more than their ratable amount, nor render the Manager liable for the subscription of any Participant. Any loss suffered by the Syndicate through the failure of any Participant to carry out his obligations hereunder shall be charged as a loss to the entire Syndicate. The Manager may be a Participant in this Syndicate, and to the extent of such participation or reservation by him shall participate in the profits or losses of the Syndicate upon the same basis as other Participants. The Manager may in his discretion permit substitution of Participants.

All expenses incurred in acquiring and marketing any shares of stock of the Company, held for account of the Syndicate, all interest charges and any other expenses, including attorneys' fees incurred in connection with this business, shall be charged against the Syndicate.

Participants shall share pro-rata, after allowing for expenses of the Syndicate, in the profits or losses. Apportionment and distribution by the Manager of profits or losses, after charging all expenses, shall be conclusive upon the Syndicate, as shall be the written statement of the Manager of the Syndicate.

The Syndicate will expire at the close of business July 29, 1929, unless sooner terminated by me, but may be extended by me from time to time, upon notice to the participants, for a period or periods not extending beyond October 28, 1929.

Any notice hereunder to Participants shall be deemed to have been duly given if mailed or telegraphed to the Participants, directed to the addresses furnished by them, or if none is furnished directed in care of Messrs. M. J. Meehan & Company.

This letter may be executed in several counterparts, each of which when so executed shall be deemed to be an original, and such counterparts together shall constitute but one and the same instrument, and the terms hereof shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors, and assigns of the parties hereto.

Please advise me of your acceptance of this participation on the terms stated, by signing the form set forth below on the enclosed duplicate of this communication.

Yours very truly,

BRADFORD ELLSWORTH,
*Manager.*

By [Signed] M. J. MEEHAN & Co.,
*Agents.*

---

Messrs. M. J. MEEHAN & COMPANY, Agents,
61 *Broadway, New York City.*

DEAR SIRS : The undersigned hereby accepts a participation of 25,000 shares in the above Syndicate upon the terms and conditions above set forth.

[Signed] PIERRE S. DU PONT,
Address to which all notices shall be sent. *9012 du Pont Bldg.,*
*Wilmington, Delaware.*

was no limitation of liability of the individual analogous to that in corporate organization, for the only limit was participant's pro rata of the whole liability, and that was not only limited merely to a. certain maximum holding of shares at any one time, but participant was liable for his pro rata of expenses, with no limit thereon. We can not think there is similarity to the limited liability usual in a corporation. The continuity of the enterprise is limited by the fact that the syndicate could be terminated at any time by the manager, would terminate in approximately sixty days, unless extended, and could be extended by the manager for only three months additional. It was, in fact, revived for an additional year, but this was by a new agreement between all parties. Continuity is further limited by the fact that no provision was made for selection of a successor to the manager, except in case of his death or assignment by him.

We think there is no essential difference in fact or principle between the syndicate here considered and that in *N. B. Whitcomb Coca-Cola Syndicate*, 35 B. T. A. 1031; affd., 95 Fed. (2d) 596, wherein the court held the syndicate to be a joint venture. See also *Commissioner* v. *Gerstle*, 95 Fed. (2d) 587, affirming 33 B. T. A. 830. We therefore hold that the Simms Petroleum Co. Syndicate was a joint venture, not an association taxable as a corporation; from which it follows that petitioner realized during the year 1929 taxable income from the syndicate in the sum of $54,411.01 and that the deficiency should be increased accordingly.

Reviewed by the Board.

*Decision on all issues will be entered under Rule 50.*

VAN FOSSAN, LEECH, AND MELLOTT concur only in the result.

---

STERNHAGEN, dissenting: As to the sale of November 13, I am of opinion that the evidence does not support finding No. 75. There is enough evidence to support a finding that, as to the shares sold on December 26, there was within 30 days an option or agreement to reacquire them, and the resulting conclusion under section 118 that no deduction for loss may be allowed. But that holding is not an adequate foundation for disbelieving or disregarding the earlier sale of November 13 or for holding that the loss thereby sustained may not be allowed. The evidence seems to me to prove that the November 13 sale was actually made and the loss sustained. The Commissioner did not determine that there was a contract or option to reacquire, and, assuming that he satisfactorily pleaded it, the evidence does not establish such an option or contract. Nor does it establish that at the time the November 13 sale occurred there was an understanding, express or tacit, that it should not be final or legally binding.

SMITH and MURDOCK agree with the above dissent.